REGENTS OF THE UNIVERSITY OF MICHIGAN v STATE OF MICHIGAN

Docket No. 87345. Submitted June 4, 1987, at Lansing. Decided February 2, 1988. Leave to appeal applied for.

The Regents of the University of Michigan brought an action in Ingham Circuit Court against the State of Michigan seeking a declaration that 1982 PA 512, which amended the Civil Rights Act to prohibit public educational institutions such as the University of Michigan from making or maintaining an investment in an organization operating in the Republic of South Africa, violates Const 1963, art 8, § 5. The trial court, Carolyn Stell, J., granted summary judgment in favor of defendant, but denied a motion for partial accelerated judgment brought by defendant on a claim that plaintiff lacked standing to challenge the constitutionality of Act 512. Plaintiff appealed and defendant cross-appealed.

The Court of Appeals *held:*

1. Article 8, § 5 conferred on plaintiff the exclusive powers of general supervision of the University of Michigan and control and direction of all expenditures from that university's fund. Act 512, as applied to plaintiff, is unconstitutional since it encroaches on plaintiff's authority to allocate university funds.

2. The standing issue raised on cross-appeal was not addressed since defendant conceded plaintiff's standing to challenge Act 512 under art 8, § 5.

Reversed.

1. CONSTITUTIONAL LAW — COLLEGES AND UNIVERSITIES — REGENTS OF THE UNIVERSITY OF MICHIGAN.

General supervision of the University of Michigan and control and direction of all expenditures from its fund rest exclusively in the Regents of the University of Michigan (Const 1963, art 8, § 5).

REFERENCES

Am Jur 2d, Colleges and Universities §§ 7, 32, 35.
See the annotations in the Index to Annotations under Colleges and Universities.

2. CIVIL RIGHTS — CONSTITUTIONAL LAW — CIVIL RIGHTS ACT —
   COLLEGES AND UNIVERSITIES — REGENTS OF THE UNIVERSITY OF
   MICHIGAN.

   The statute which amended the Civil Rights Act to prohibit
   public educational institutions from making or maintaining an
   investment in an organization operating in the Republic of
   South Africa, as applied to the University of Michigan, violates
   a provision of the Michigan Constitution which granted exclu-
   sive control and direction of all expenditures from that univer-
   sity's fund to the Regents of the University of Michigan (Const
   1963, art 8, § 5; MCL 37.2402[f]; MSA 3.548[402][f]).

*Roderick K. Daane,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gerald F. Young, James E. Riley,* and *Frank J. Monticello,* Assistant Attorneys General, for defendant.

Amici Curiae:

*W. Perry Bullard* and *Virgil Smith, Jr.,* in propria personae.

*Patricia Eames, Michael J. Kiley, Kenneth A. McKanders* and *Maria Alfaro-Lopez,* for the Board of Governors of Wayne State University.

*Jordan Rossen, Richard W. McHugh, Robert F. Gillett* and *Edgar J. Dew,* for the International Union of the United Auto Workers, the National Lawyers Guild, the National Conference of Black Lawyers, the Black Student Union of the University of Michigan, the Peace Education Center, the Institute for Global Education, and the American Committee on Africa.

Before: D. F. WALSH, P.J., and CYNAR and R. L. TAHVONEN,* JJ.

D. F. WALSH, P.J. Plaintiff, the body corporate known as the Regents of the University of Michigan, appeals from a circuit court order denying its motion for summary judgment under GCR 1963, 117.2(3), now MCR 2.116(C)(10), and granting summary judgment under GCR 1963, 117.2(1), now MCR 2.116(C)(8), to defendant, the State of Michigan. Defendant cross-appeals from a circuit court order denying defendant's motion for partial accelerated judgment. At issue on appeal is the constitutionality of 1982 PA 512, which amended the Civil Rights Act (CRA), MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.* On cross-appeal, defendant challenges plaintiff's standing to raise certain constitutional challenges to Act 512.

Appearing as amici curiae before this Court are the Board of Governors of Wayne State University; State Representatives Perry Bullard and Virgil Smith, Jr., principal sponsors of Act 512; the Black Student Union of the University of Michigan; the Peace Education Center; the Institute for Global Education; the National Conference of Black Lawyers; the International Union of the United Auto Workers; the National Lawyers Guild; and the American Committee on Africa.

The CRA prohibits discriminatory practices, policies and customs in the exercise of rights based on religion, race, color, national origin, age, sex, height, weight and marital status. Article 4 of CRA addresses the issue of discrimination by educational institutions. MCL 37.2401 *et seq.*; MSA 3.548(401) *et seq.* Act 512 amended § 402 of Article 4 by adding the requirement that educational

* Circuit judge, sitting on the Court of Appeals by assignment.

institutions, which include public universities, MCL 37.2401; MSA 3.548(401), shall not

(f) Encourage or condone legally required discrimination against an individual on the basis of race or color by knowingly making or maintaining after April 1, 1984, an investment in an organization operating in the republic of South Africa. This subdivision shall not apply to a private educational institution.

(g) Encourage or condone religious discrimination or ethnic discrimination by knowingly making or maintaining after February 1, 1983, an investment in an organization operating in the Union of Soviet Socialist Republics. [MCL 37.2402; MSA 3.548(402).][1]

Plaintiff is the constitutional body corporate known as the Regents of the University of Michigan. Const 1963, art 8, § 5. The Constitution confers on plaintiff, as it does on the controlling boards of the other institutions of higher education established by Michigan law and authorized to

[1] Act 512 further provided:

(2) The department [of civil rights] shall compile, from information obtained from the United States department of commerce, a current register of organizations operating in the republic of South Africa and the Union of Soviet Socialist Republics. The department shall make the register available, upon request, to a person, board, or commission for a reasonable charge.

(3) As used in this section:

(a) "Investment" means money placed in shares of stock and other equity interests. Investment does not include an evidence of indebtedness arising from a transfer of direct obligations of, or obligations that are fully guaranteed as to principal and interest by, the United States or any agency thereof, that a bank is obligated to repurchase or a bank deposit made in the ordinary course of business.

(b) "Organization" means a United States firm, or a subsidiary or affiliate of a United States firm, as determined by the United States department of commerce. [MCL 37.2402; MSA 3.548(402).]

grant baccalaureate degrees, the "general supervision of its institution and the control and direction of all expenditures from the institution's funds." Const 1963, art 8, §§ 5 and 6. Candidates for membership on the eight-member Board of Regents are nominated at the state convention of each political party. The regents, whose eight-year terms are staggered, are elected at the state general election. They are subject to recall and to removal by impeachment. Const 1963, art 8, § 5, MCL 168.281 et seq.; MSA 6.1281 et seq.

On July 15, 1983, plaintiff commenced this action seeking a declaratory judgment that Act 512 is unconstitutional. Plaintiff's principal challenge was that Act 512 contravenes Const 1963, art 8, § 5 in attempting to restrict plaintiff's authority to control and direct expenditures of the university's funds. Attached to plaintiff's complaint was a copy of an April 15, 1983, resolution of the regents whereby, subject to limited exceptions, the chief financial officer of the university was directed to divest the university of its interest in investments in shares of corporate stock and other equities of organizations operating in the Republic of South Africa.[2] Also attached to plaintiff's complaint were

---

[2] The resolution provides:

WHEREAS, after a year of intensive study and broad campus discussion and debate, the Regents in our resolution of March 16, 1978, stated our belief that the system of apartheid and the oppressive practices of the government of the Republic of South Africa related thereto are immoral and unconscionable, and required a high degree of social responsibility for corporations having operations in South Africa; and

WHEREAS, the Regents recognize and sincerely appreciate the good faith efforts and the courageous actions of many United States corporations having operations in South Africa, and in particular the Michigan based corporations such as Ford Motor Company, General Motors, Dow Chemical and Kellogg, among others, and the good management such conduct reflects; and

WHEREAS, notwithstanding the signs of progress in South

Africa, such as increased recognition and growth of black trade unions, improved pay and working conditions for blacks, improved education and housing opportunities for blacks, and limited dispensations ending segregation in certain sports activities and certain places of public accommodation, there also have been adverse changes such as increased bannings, increased arrests for pass law violations, increased efforts to implement an involuntary Bantustan policy, and a total failure to address political rights of blacks in proposed constitutional reforms; and

WHEREAS, the Regents believe that progress to end apartheid has been too slow, and the government of the Republic of South Africa does not understand the depth of American feeling in this matter; and

WHEREAS, it is the obligation of the Board of Regents to act in a way consistent with its fiduciary duties; and

WHEREAS, the Board has concluded, subject to the exceptions noted below, that it is undesirable for The University of Michigan to continue to hold shares of corporate stock or other equity investments in organizations operating in the Republic of South Africa.

IT IS THEREFORE RESOLVED, that the Board hereby directs the Vice President and Chief Financial Officer to take prudent action to replace equity investments in any organizations operating in the Republic of South Africa with alternative investments selected to provide, as nearly as possible, a substantially equivalent level of portfolio diversification and quality.

IT IS FURTHER RESOLVED, that the Board directs the Vice President and Chief Financial Officer to make no further investments in shares of corporate stock and other equities of organizations operating in the Republic of South Africa, and to take appropriate action to divest The University of Michigan of its present interest in such investments at the earliest time when it is financially prudent to do so.

IT IS FURTHER RESOLVED, that notwithstanding the foregoing, this Resolution shall not operate to cause the divestiture or to prevent the acquisition by The University of Michigan of investments in corporate stocks or other equities described below:

a. Investments in corporations headquartered in Michigan or which employ substantial numbers of employees in Michigan, provided that dividends derived from that proportion of such corporations' earnings attributable to their South Africa operations shall be devoted by the University to programs intended to promote educational opportunities related to South Africa.

b. Investments in The University of Michigan Buy-Write Program.

c. Investments acquired by The University of Michigan from third-party donors and maintained in a specifically invested account at the suggestion of the donor.

IT IS FURTHER RESOLVED, that the Vice President and Chief

lists of university investments in companies doing business in the Union of Soviet Socialist Republics and the Republic of South Africa. The market values of such investments as of June 30, 1983, were $17,756,507.90 and $51,636,241.54, respectively. Each of the listed companies doing business in the U.S.S.R. also did business in South Africa.[3] The parties both moved for summary judgment. The circuit court rejected each of plaintiff's challenges to Act 512 and granted summary judgment to defendant. We reverse.

In the Constitution of 1850, provision was first made for the election of regents of the University of Michigan. Const 1850, art 13, § 6. In addition, in language largely echoed in the 1908[4] and present constitutions, the Constitution of 1850 conferred on the regents "the general supervision of the University, and the direction and control of all expenditures from the university interest fund." Const 1850, art 13, § 8. The significance of these developments and of the consequent independent nature of the university has been the subject of considerable comment:

> Under the Constitution of 1835, the legislature had the entire control and management of the University and the University fund. They could

Financial Officer shall initiate appropriate efforts to encourage corporations in which the University owns stock or other equities to withdraw from the Republic of South Africa.

[3] The university also participated in a common fund for equities which had investments in companies operating in the U.S.S.R. and in South Africa. The fund, in which the university held 2741.58 shares, had a book value of $3,383,796.86.

The parties agree that the extent of the university's investments which are prohibited by Act 512 has decreased substantially since commencement of this action. Nonetheless, because the university continues to hold prohibited investments, plaintiff's challenges to Act 512 are not moot.

[4] Const 1908, art 11, § 5.

appoint regents and professors, and establish departments. The University was not a success under this supervision by the legislature, and, as some of the members of the constitutional convention of 1850 said in their debates, "some of the denominational colleges had more students than did the University." Such was the condition of affairs when that convention met. It is apparent to any reader of the debates in this convention in regard to the constitutional provision for the University that they had in mind the idea of permanency of location, to place it beyond mere political influence, and to intrust it to those who should be directly responsible and amenable to the people.

\* \* \*

The result has proved their wisdom, for the University, which was before practically a failure, under the guidance of this constitutional body, known as the "Board of Regents," has grown to be one of the most successful, the most complete, and the best-known institutions of learning in the world.

\* \* \*

Obviously, it was not the intention of the framers of the Constitution to take away from the people the government of this institution. On the contrary, they designed to, and did, provide for its management and control by a body of eight men elected by the people at large. They recognized the necessity that it should be in charge of men elected for long terms, and whose sole official duty it should be to look after its interests, and who should have the opportunity to investigate its needs, and carefully deliberate and determine what things would best promote its usefulness for the benefit of the people. Some of the members of the convention of 1850 referred in the debates to two colleges (one in Virginia and the other in Massachusetts) which had been failures under the management by the State. It is obvious to every intelligent and reflecting mind that such an institution would be safer and more certain of perma-

nent success in the control of such a body than in that of the legislature, composed of 132 members, elected every two years, many of whom would, of necessity, know but little of its needs, and would have little or no time to intelligently investigate and determine the policy essential for the success of a great university. [*Sterling v Regents of the University of Michigan,* 110 Mich 369, 374, 377, 379-380; 68 NW 253 (1896).]

The respondents are constitutional officers, to whom are confided by the constitution (art. xiii, § 8) "the general supervision of the university, and the direction and control of all expenditures from the university interest fund." They are elected by the people. They come at short intervals fresh from the body of the people, and cannot be supposed to be influenced by sentiments not common to those they represent. To their judgment and discretion as a body is committed the supervision of the financial and all other interests of an institution in which all the people of this state have a very great interest. [*People ex rel Drake v Regents of the University of Michigan,* 4 Mich 98, 104 (1856).]

Under the Constitution, the State cannot control the action of the Regents. It cannot add to or take away from its property without the consent of the Regents.

\* \* \*

Property aggregating in value nearly or quite half a million of dollars has been donated to the University by private individuals. Such property is the property of the University. It is not under the control of the State when it acts through its executive or legislative departments, but of the Regents, who are directly responsible to the people for the execution of their trust. So, when the State appropriates money to the University it passes to the Regents, and becomes the property of the University, to be expended under the exclusive direction

of the Regents, and passes beyond the control of
the State through its legislative department.

\* \* \*

The University is the property of the people of
the State, and in this sense is State property, so as
to be exempt from taxation. *Auditor General v
Regents,* 83 Mich 467 [47 NW 440 (1890)]. But the
people, who are the corporators of this institution
of learning, have, by their Constitution, conferred
the entire control and management of its affairs
and property upon the corporation designated as
"the Regents of the University of Michigan," and
have thereby excluded all departments of the
State government from any interference
therewith. . . . The people may, by their Constitu-
tion, place any of its institutions or property be-
yond the control of the Legislature. [*Weinberg v
Regents of the University of Michigan,* 97 Mich
246, 254-255; 56 NW 605 (1893).]

The issue of the extent to which legislative
action may, if at all, permissibly impinge on the
authority granted to the governing boards of Mich-
igan's state universities is not new to the jurispru-
dence of our state. The Michigan Supreme Court
has repeatedly affirmed the constitutional indepen-
dence and exclusive authority of art 8, § 5 boards
in the face of attempted legislative encroachment.
*Weinberg v Regents of the University of Michigan,
supra; Sterling v Regents of the University of
Michigan, supra; Bd of Regents of the University
of Michigan v Auditor General,* 167 Mich 444; 132
NW 1037 (1911); *State Bd of Agriculture v Auditor
General,* 180 Mich 349; 147 NW 529 (1914); *State
Bd of Agriculture v Auditor General,* 226 Mich
417; 197 NW 160 (1924). The appellate courts have
variously described the extensive authority con-
ferred under art 8, § 5: *Weinberg v Regents of the
University of Michigan, supra,* p 254 ("the entire
control and management of university affairs and

property"); *Bd of Regents v Auditor General, supra,* pp 450, 452 ("independent control of the affairs of the University"; "right to control the affairs and finances of the institution"); *People for use of Regents of the University of Michigan v Brooks,* 224 Mich 45, 48; 194 NW 602 (1923) ("independent of the State as to the management and control of the university and its property"); *State Bd of Agriculture v Auditor General, supra,* pp 424, 426 ("absolute management of the University, and the exclusive control of all funds received for its use"; "[t]he business policy and management of all of the affairs of the college [now Michigan State University] belongs to the State board of agriculture [now Board of Trustees of Michigan State University]"); *The William C Reichenbach Co v Michigan,* 94 Mich App 323, 335; 288 NW2d 622 (1979) ("entire control and management of property and expenditure of funds to the exclusion of all other departments of the state"). See also *Marquette Co v Bd of Control of Northern Michigan University,* 111 Mich App 521, 526; 314 NW2d 678 (1981), concerning Const 1963, art 8, § 6 ("constitutional grant of autonomy for educational-fiscal decisions"). The courts have clearly interpreted the Constitution as conferring general fiscal autonomy on the university boards.

In this case, the circuit court found that Act 512 does not contravene art 8, § 5 because it does not impinge on the "expenditure" of university funds but only on the "investment" of those funds. We agree with plaintiff that reliance on selected dictionary definitions offers an insufficient basis for the constitutional adjudication demanded by this case. As plaintiff additionally notes, any investment of funds entails what even the circuit court would be constrained to agree is the incidental expenditure of funds. And, as noted *supra,* the appellate courts

have interpreted art 8, § 5 as conferring general fiscal autonomy on the university boards.

The circuit court's opinion suggests that the court found its principal rationale for upholding Act 512 against plaintiff's art 8, § 5 attack in the cases of *Peters v Michigan State College,* 320 Mich 243; 30 NW2d 854 (1948), *Branum v Bd of Regents of the University of Michigan,* 5 Mich App 134; 145 NW2d 860 (1966), and *Regents of the University of Michigan v Employment Relations Comm,* 389 Mich 96; 204 NW2d 218 (1973). We are persuaded that those cases do not support the circuit court decision.

In *Peters v Michigan State College,* an equally divided Supreme Court upheld the order of the Department of Labor that Michigan State College was subject to the workers' compensation act. In the course of his opinion for affirmance, Justice REID stated:

> [T]he provision of the Constitution giving the State board of agriculture sole control of the funds of the college does not generally exempt the said board from the great body of general laws of this State.
>
> \* \* \*
>
> The purpose of the workmen's compensation act partakes of the nature of the exercise of police power. It is aimed at promoting the welfare of the people of the State.
>
> \* \* \*
>
> The act is approved as a piece of legislation aimed not at the defendant alone, nor against any of the activities of the defendant of a nature peculiar to defendant. The act is of a broad scope addressed to the subject of the liability of employers in broad fields of employment. The workmen's compensation act does not undertake to change or disturb the educational activities of the defendant board.

> The control of State college funds must be considered as given to defendant for the purposes of the particular and peculiar educational activities of the State college, not for the purpose of disturbing the general relationship in this State of employer and employee, nor evading laws enacted to promote the general welfare of the people of this State. [320 Mich 248-251.]

Three justices concurred "on the ground that the workmen's compensation act is a valid exercise of the police power." 320 Mich 251.

Speaking for the four justices who voted to reverse, Justice DETHMERS observed that to hold that the college was not subject to the workers' compensation act would not be tantamount to immunizing the college from all legislation or exempting it from the general laws of the state. 320 Mich 262.

In *Branum v Bd of Regents of the University of Michigan, supra,* this Court rejected the regents' claim that the Legislature could not waive the university's governmental immunity. The Court noted that the Supreme Court had abrogated the judicial doctrine of governmental immunity, and that the clear public policy of Michigan was that the defense of governmental immunity should no longer exist. 5 Mich App 138. Citing *Peters v Michigan State College, supra,* the Court concluded:

> It is the opinion of this Court that the legislature can validly exercise its police power for the welfare of the people of this State, and a constitutional corporation such as the board of regents of the University of Michigan can lawfully be affected thereby. The University of Michigan is an independent branch of the government of the State of Michigan, but it is not an island. Within the confines of the operation and the allocation of

funds of the University, it is supreme. Without these confines, however, there is no reason to allow the regents to use their independence to thwart the clearly established public policy of the people of Michigan. [5 Mich App 138-139.]

The case of *Regents of the University of Michigan v Employment Relations Comm, supra,* presented the issue whether Const 1963, art 8, § 5 would be violated by application of the public employment relations act (PERA), MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.,* to the University of Michigan Interns-Residents Association, a group of interns, residents and post-doctoral fellows connected with the University of Michigan Hospital and its affiliates. Finding that the University of Michigan is a public employer for purposes of PERA, the Supreme Court identified the issue as whether art 8, § 5 could be harmonized with art 4, § 48, through which "[t]he people . . . have deemed the resolution of public employee disputes a matter of public policy."[5] Expressing agreement with the reasoning of this Court in *Branum,* the Supreme Court found that the interns, residents and postdoctoral fellows could be employees and have the right to organize under PERA without infringing on the constitutional autonomy of the board of regents. 389 Mich 108. The Supreme Court noted, however, that the scope of bargaining could be limited if the subject matter fell "within the educational sphere." 389 Mich 109.

In the instant case, the circuit court found that there is no violation of art 8, § 5 "when an enactment of the Legislature under its police power

---

[5]  The legislature may enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service. [Const 1963, art 4, § 48.]

would impose limitations or requirements on the Regents' actions *not within the educational sphere.*" (Emphasis in original.) The court's reasoning that Act 512 was "a valid exercise of the police power" was as follows:

> If the Legislature can provide for labor peace, for some measure of tort recovery and for indemnification of injured workers under the remedial principles of the workers' compensation laws, this Court holds that the Legislature can likewise provide for freedom from any and all vestiges of racial, religious and ethnic discrimination that have long injured our society.

We are persuaded that, in contrast to the cases on which the circuit court relied, the controversy in this case does not revolve around a public policy clearly established in Michigan.

All agree that the clearly established public policy of our state strictly prohibits racial and religious discrimination in the exercise of civil rights. Const 1963, art 1, § 2, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.* It is also beyond dispute that the apartheid system of South Africa is repugnant to our common sense of morality and justice.[6] Neither the people nor the Legislature, however, have clearly declared that Michigan public policy prohibits investment of public funds in organizations operating in South Africa. Act 512 is directed solely at educational institutions. The Legislature has not prohibited all investment of public funds in organizations operating in South Africa. Such investment of public employees' pen-

[6] Act 512 prohibits investment not only in South Africa but also in the Soviet Union. The parties have focused their attention on South Africa, however, and we therefore do likewise.

sion funds, for example, has not been prohibited.[7] While Act 512 has not been the Legislature's only statement concerning investments in South Africa,[8] we find that the investment standards contained in Act 512 do not yet reflect "a clearly established public policy" in this state. *Branum v Bd of Regents of the University of Michigan, supra,* p 139.

The circuit court found that university autonomy is limited to "the educational sphere." See *Regents of the University of Michigan v Employment Relations Comm, supra,* p 107. We do not read the *Employment Relations Comm* case as restricting university autonomy to a strictly "educational sphere." In any event, we agree with plaintiff that the distinction, if any, between the "educational" and "noneducational" spheres of a major research university is indistinct and often indiscernible. The Constitution contains no "educational sphere" limitation.

In *Regents of the University of Michigan v Employment Relations Comm, supra,* the Supreme Court agreed with this Court that "within the confines of the operation and the allocation of funds of the University, [the University] is supreme." 389 Mich 108, citing *Branum v Bd of Regents of the University of Michigan, supra,* p

---

[7] House Bills 4395 and 4396, which direct divestment of public employees' pension assets in stocks, securities and other obligations of national corporations of South Africa and of United States firms doing business in South Africa, were approved by the State House of Representatives on May 19, 1987. 1987 Journal of the House 1254-1255 (No. 47, May 19, 1987). However, no further action has been taken on the bills, which have been in the Senate Judiciary Committee since May 20, 1987. 1987 Journal of the Senate 1281-1283 (No. 48, May 20, 1987.) At oral argument before this Court, Representative Bullard, a sponsor of the bills, acknowledged that the considerable amounts of money involved in the subject funds render the bills highly controversial.

[8] See MCL 21.145(5); MSA 3.693(5), MCL 129.91(2); MSA 3.843(1)(2), MCL 129.43; MSA 5.1553, MCL 389.142(3); MSA 15.615(1142)(3).

139. Because Act 512 impermissibly encroaches on plaintiff's authority to allocate university funds, it violates Const 1963, art 8, § 5.

Defendant argues that Act 512 is a permissible exercise of legislative power under Const 1963, art 9, § 19, which provides:

> The state shall not subscribe to, nor be interested in the stock of any company, association or corporation, except that funds accumulated to provide retirement or pension benefits for public officials and employees may be invested as provided by law; and *endowment funds created for charitable or educational purposes may be invested as provided by law governing the investment of funds held in trust by trustees* and other state funds or money may be invested in accounts of a bank, savings and loan association, or credit union organized under the laws of this state or federal law, as provided by law.

This provision, however, does not confer on the Legislature general power to regulate university investments. Plaintiff concedes that, if the Legislature amended "the law governing the investment of funds held in trust by trustees" to mandate divestment by trustees in general, investment of university endowment funds would be governed thereby. Act 512 does not represent such an amendment.

We hold that, as applied to plaintiff, Act 512 is unconstitutional. Because we find that the act violates art 8, § 5, we do not address the remaining challenges made by plaintiff. Nor do we address the standing issue raised on cross-appeal, since defendant concedes plaintiff's standing to challenge the statute under art 8, § 5.

Reversed. No costs.