FEDERATED PUBLICATIONS, INC v BOARD OF TRUSTEES OF
MICHIGAN STATE UNIVERSITY

Docket No. 177264. Submitted July 11, 1996, at Lansing. Decided January
14, 1997, at 9:00 A.M. Leave to appeal sought.

Federated Publications, Inc., doing business as The Lansing State
Journal and The Detroit News, Inc., brought an action in the Ing-
ham Circuit Court against the Board of Trustees of Michigan State
University, seeking a preliminary injunction against private deliber-
ations by the presidential search committee that the board had cre-
ated for the purpose of reviewing the applications of applicants for
the position of president of the university. At the time the injunc-
tion was sought, May of 1993, the committee consisted of four of
the eight trustees and nine lay persons. The committee was
charged with reviewing applications, interviewing candidates, and
arriving at a list of five or so candidates that would be considered
by the full board of trustees at a public meeting. The committee
undertook its charged duties in private. The court, James R. Gid-
dings, J., denied the requested preliminary injunction, denied a
motion by the plaintiff to compel deposition witnesses to identify
the persons under consideration by the committee, and, ultimately,
granted summary disposition for the defendant, holding that the
provisions of the Open Meetings Act could not be constitutionally
applied to the selection of the president of a university established
pursuant to Const 1963, art 8, § 5. The plaintiff appealed.

The Court of Appeals *held*:

1. Although state universities have been held to be distinct gov-
ernmental bodies coequal with the Legislature, they are not
immune from all regulation by the Legislature. Statutes that are
designed for the benefit of society as a whole can be imposed on a
constitutionally created university where the statutes pose no
direct threat to the university's financial autonomy or control of
educational matters. Because the Open Meetings Act is designed to
provide the public with a fuller disclosure of the acts of govern-
ment officials and neither was aimed at any activities particular to
constitutionally created universities nor attempted to change or
disturb the educational activities of those universities, it can be
constitutionally applied to universities such as the defendant.

2. The effect of the Open Meetings Act with respect to state universities is minimal. Although it requires that much of the process of selecting a university president be done in public, it does not tell the board what the criteria should be for that selection, how to select a candidate, or whom to select as president. It merely requires that, when interviewing candidates and when making a detailed review of applications of candidates who do not request confidentiality, the university function in public meetings. It does not divest the board of its authority to select a president.

3. To the extent that the Open Meetings Act interferes with the selection of a president by causing good candidates to withdraw their names from consideration, it is a matter that goes not to the constitutionality of the application of the Open Meetings Act to constitutionally created universities, but rather goes to the wisdom of the act, a matter properly addressed to the Legislature.

4. Constitutionally created universities, while autonomous in certain matters, are not a fourth branch of government.

5. The presidential search committee was a public body within the meaning of the Open Meetings Act, and its activities were subject to the provisions of that act.

6. The defendant did not unlawfully delegate to the presidential search committee its authority to select the president of the university.

Reversed in part and affirmed in part.

C. A. NELSON, J., dissenting, stated that the trial court's order of summary disposition should be affirmed because the Supreme Court has held that constitutionally created universities are coequal to other branches of government and because the Open Meetings Act cannot be applied with respect to a constitutionally derived power and the authority of the defendant to select the president of the university is one of its constitutionally enumerated powers. Accordingly, the trial court correctly found that the Open Meetings Act could not be constitutionally applied to the defendant's presidential selection process.

1. SCHOOLS — PUBLIC UNIVERSITIES — PRESIDENTIAL SEARCHES — OPEN MEETINGS ACT.

All deliberations, decisions, and interviews regarding presidential searches of constitutionally created public universities must be conducted in a manner consistent with the provisions of the Open Meetings Act (MCL 15.261 *et seq.*; MSA 4.1800[11] *et seq.*).

2. SCHOOLS — PUBLIC UNIVERSITIES — BRANCHES OF GOVERNMENT.

Constitutionally created universities, while autonomous in certain matters, do not constitute a fourth branch of government.

3. SCHOOLS — PUBLIC UNIVERSITIES — PRESIDENTIAL SEARCHES — COMMITTEES
   — OPEN MEETINGS ACT.

   A presidential search committee composed of both some of the trust-
   ees of a constitutionally created public university and members of
   the public and charged with the job of reviewing the applications
   of interviewing applicants and of recommending candidates for the
   post of the president of the university is a public body within the
   meaning of the Open Meetings Act (MCL 15.262[a]; MSA
   4.1800[12][a]).

*Foster, Swift, Collins & Smith, P.C.* (by *Webb A. Smith* and *Charles E. Barbieri*), for the plaintiff.

*Hooper, Hathaway, Price, Beuche & Wallace* (by *Roderick K. Daane*), for the defendant.

Amici Curiae:

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Irene M. Mead* and *Amy L. Rosenberg*, Assistant Attorneys General, for the Attorney General.

*Hackett, Maxwell & Phillips, P.L.L.C.* (by *Dawn L. Phillips*), for the Michigan Press Association and The State News.

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *Carl H. Von Ende, Gregory L. Curtner*, and *Charles A. Duerr, Jr.*), for the Board of Control of Northern Michigan University and others.

Before: NEFF, P.J., and FITZGERALD and C. A. NELSON[*], JJ.

FITZGERALD, J. Federated Publications, Inc., doing business as The Lansing State Journal and The Detroit News, Inc., brought suit against the Board of

---

[*] Circuit judge, sitting on the Court of Appeals by assignment.

Trustees of Michigan State University alleging that the procedures used by the university in the selection of M. Peter McPherson as president of the university violated the Open Meetings Act (OMA), MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.* The trial court, finding, among other things, that the OMA could not be constitutionally applied to this process, granted summary disposition in favor of defendant. Plaintiff appeals as of right. We reverse in part and affirm in part.

This appeal concerns the actions of the Board of Trustees of Michigan State University in electing M. Peter McPherson as president of the university following the resignation of President John DiBiaggio in the summer of 1992. After DiBiaggio's resignation, Gordon Guyer was appointed interim president and, in January 1993, the board of trustees created the original presidential search committee (PSC) that consisted of all eight trustees and nine lay persons. On April 8, 1993, as a result of a publication of a list of candidates by the State News, the PSC was reconstituted to consist of four trustees and the nine lay persons. The purpose of the reconstituted PSC was to preserve the confidentiality of the candidates before their interviews with the entire board and to do so in such a manner as to avoid a violation of the OMA.

The board of trustees passed a resolution charging the PSC with reviewing candidate applications, interviewing candidates, and arriving at a list of five or so candidates that would be considered by the full board of trustees at a public meeting. The smaller PSC reviewed the applications, discussed candidates, narrowed the list of candidates, and interviewed candidates in private. As a result of these activities, the PSC produced a list of four candidates that were

announced on July 16, 1993. On July 27, 1993, a public meeting of the full board of trustees was held to interview the finalists, but no consensus was reached, and the matter was referred back to the PSC. At a meeting held on August 3, 1993, the PSC declined to put forth any more candidates. Subsequently, on August 17, 1993, a meeting of the entire board of trustees was called for the purpose of publicly interviewing M. Peter McPherson for president. McPherson was elected by a six to two vote of the board of trustees at that meeting.

In May 1993, plaintiff brought this suit and requested a preliminary injunction against private deliberations by the newly reconstituted PSC. The trial court denied the motion for a preliminary injunction and later denied a motion to compel deposition witnesses to identify the persons who were under consideration by the PSC for the position of university president. The parties subsequently brought cross motions for summary disposition. The trial court granted defendant's motion and found, among other things, that the OMA could not be constitutionally applied to the selection of a president for any university that was established under Const 1963, art 8, §§ 4 and 5. Plaintiff argues that the trial court erred in its constitutional analysis. We agree.

When reviewing constitutional provisions, the objective of such review is to give effect to the intent of the people who adopted the constitution. *Livingston Co v Dep't of Management & Budget*, 430 Mich 635, 641-642; 25 NW2d 65 (1988); *Macomb Co Taxpayers Ass'n v L'Anse Creuse Public School*, 213 Mich App 71, 78; 540 NW2d 684 (1995). In discerning such intent, we look at the circumstances surrounding the

adoption of the provision and the purpose sought to be accomplished by its enactment. *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971). However, the primary source of understanding the constitution is its plain meaning as understood by the people who voted for it. *Livingston Co, supra.* Constitutional language is to be read according to its natural, common, and most obvious meaning. *Macomb Co, supra.* Courts may place themselves in the position of the framers of the constitution to ascertain its meaning at that time. *Committee for Constitutional Reform v Secretary of State*, 425 Mich 336, 342; 389 NW2d 430 (1986). Reliance on the records of the constitutional convention is warranted only if the language of the constitution is unclear or if there is a "recurring thread of explanation binding together the whole of a constitutional concept." *Regents of the Univ of Michigan v Michigan*, 395 Mich 52, 60; 235 NW2d 1 (1975). Due deference is to be given to contemporaneous or longstanding interpretations of the constitution by the Michigan Supreme Court. *McPherson v Secretary of State*, 92 Mich 377, 383; 52 NW 469 (1892).

Plaintiff argues that the trial court erred in finding that the language in Const 1963, art 8, §§ 4 and 5 should be interpreted to bar application of the OMA to the selection of a president for a constitutionally established state university. Section 5, in pertinent part, states:

> [T]he trustees of Michigan State University and their successors in office shall constitute a body corporate known as the Board of Trustees of Michigan State University . . . . Each board shall have general supervision of its institution and the control and direction of all expenditures from the

institution's funds. Each board shall, as often as necessary, elect a president of the institution under its supervision. He shall be the principal executive officer of the institution, be ex-officio a member of the board without the right to vote and preside at meetings of the board. The board of each institution shall consist of eight members who shall hold office for terms of eight years and who shall be elected as provided by law. The governor shall fill board vacancies by appointment. Each appointee shall hold office until a successor has been nominated and elected as provided by law.

Section 4, in pertinent part, states, with respect to all state universities established by law:

The legislature shall be given an annual account of all income and expenditures by each of these educational institutions. Formal sessions of governing boards of such institutions shall be open to the public.

Historically, the Supreme Court has found the Regents of the University of Michigan to be a distinct governmental body that is coequal with the Legislature. *Sterling v Univ of Michigan Regents*, 110 Mich 369; 68 NW 253 (1896); *Weinberg v Regents of Univ of Michigan*, 97 Mich 246; 56 NW 605 (1893).[1] In these cases, the Court refused to apply acts of the Legislature to the University of Michigan because the Constitution of 1850 had given controlling power over the university and its property to the regents. The Court in *Sterling* stated that the basis of the majority opinion in *Weinberg* was that "the board of regents is a constitutional body, charged by the Constitution with the entire control of that institution." *Sterling, supra*

---

[1] As will be discussed later, *Weinberg* was overruled by *W T Andrew Co, Inc v Mid-State Surety Corp*, 450 Mich 655; 545 NW2d 351 (1996). However, the Court overruled *Weinberg* while affirming the basic underpinnings of the case regarding the independent nature of the universities.

at 381-382. The Court reasoned that, where the constitution directly conferred a power upon one constitutional body (the regents of the university), it necessarily excluded the existence of that power in another constitutional body (the Legislature) unless the constitution contained language indicating a contrary intent. *Id.* at 382. Michigan State University has followed a parallel course of constitutional maturity. *Regents of the Univ of Michigan v Michigan, supra* at 64.

Although state universities have been held to be distinct governmental bodies coequal with the Legislature, they have not been held constitutionally immune from all regulation by the Legislature. In *W T Andrew Co, Inc v Mid-State Surety Corp*, 450 Mich 655, 668-669; 545 NW2d 351 (1996), the Court held that, although the University of Michigan was a constitutionally created corporation, the public works bond statute could be applied to it through the Legislature's police power. It found that statutes that are designed for the benefit of society as a whole can be imposed on a constitutionally created university when those statutes pose no direct threat to the university's financial autonomy. *Id.* In *W T Andrew, supra* at 665-667, the Court cited with approval the lead opinion in *Peters v Michigan State College*, 320 Mich 243; 30 NW2d 854 (1948), that applied the workmen's compensation laws to the college. In that opinion, Justice REID stated that the workmen's compensation laws were not aimed at the college alone or against any of the activities that were peculiar to it. *Id.* at 250. He stated that the act was broad in scope and did not attempt to change or disturb the educational activities of the college (which became Michigan State Univer-

sity in 1954). *Id.* He further held that the constitutional provisions establishing the college could not be construed to withhold from the Legislature the ability to make the college subject to the act. *Id.* at 251.

The Court previously had held the University of Michigan subject to a state law in *Regents of Univ of Michigan v Employment Relations Comm*, 389 Mich 96; 204 NW2d 218 (1973). In that case, the Court found that the Michigan Public Employees Relations Act could be constitutionally applied to state universities without violating their autonomy. *Id.* at 108. In so finding, it cited this Court's opinion in *Branum v Univ of Michigan Bd of Regents*, 5 Mich App 134; 145 NW2d 860 (1966). In *Branum*, this Court found that while universities have independence in educational matters, they are still a part of the state government, and, as such, the Legislature could waive their rights to governmental immunity as it did for other sections of state government. *Id.* at 137-138. In particular, this Court stated:

> It is the opinion of this Court that the legislature can validly exercise its police power for the welfare of the people of this State, and a constitutional corporation such as the board of regents of the University of Michigan can lawfully be affected thereby. The University of Michigan is an independent branch of the government of the State of Michigan, but it is not an island. Within the confines of the operation and the allocation of the funds of the University, it is supreme. Without these confines, however, there is no reason to allow the regents to use their independence to thwart the clearly established public policy of the people of Michigan. [*Id.* at 138-139.]

We agree with the argument of the Attorney General in his brief as amicus curiae that the clear public

policy of this state is to promote openness in government. "Sunshine laws" were adopted as early as 1895 in Michigan. *Wexford Co Prosecutor v Pranger*, 83 Mich App 197, 201, n 5; 268 NW2d 344 (1978). The purpose behind sunshine laws such as the OMA is to prevent the real and imminent danger of irreparable injury when governmental bodies act in secret. *Id.* In that regard, this Court has stated that the purpose of the OMA is to "provide the public with fuller disclosure of the acts of government officials." *Rochester Community Schools Bd of Ed v State Bd of Ed*, 104 Mich App 569, 582; 305 NW2d 541 (1981). Because the purpose of the OMA is to promote openness in government, we give it a broad interpretation. *Detroit News, Inc v Detroit*, 185 Mich App 296; 460 NW2d 312 (1990).

The longstanding public policy of this state to open the acts of governmental officials to public scrutiny supports the conclusion that the OMA can be constitutionally applied to universities. The OMA is not aimed at any activities peculiar to the university and does not attempt to change or disturb its educational activities. In fact, the effect of the OMA with respect to public universities is minimal. Although it requires that much of the process of selecting a university president be done in public, it does not tell the board what the criteria should be for that selection, how to select a candidate, or whom to select as president. It merely requires that, when interviewing candidates and when making a detailed review of applications of candidates who do not request confidentiality, the university function in public meetings. It does not divest the board of its authority to select a president.

Defendant argues that the OMA interferes with its selection of a president because it results in good candidates withdrawing their names from consideration. However, that argument does not go to the constitutionality of the application of the OMA. Instead, it raises the issue whether the clear public policy of openness in government is a good public policy as it applies to state universities. That argument is properly pursued only in the Legislature.[2]

Finally, defendant argues that because the Supreme Court found in *In re 1976 PA 267*, 400 Mich 660; 255 NW2d 635 (1977), that the OMA could not be constitutionally applied to the Court, it likewise cannot be applied to public universities that have been found to be coequal branches of government. We disagree. In *In re 1976 PA 267*, the Court noted that the powers of government were divided among *three* branches of government pursuant to Const 1963, art 3, § 2. It further noted that the separation of powers set forth in the constitution was "designed to preserve the independence of the three branches of government." *Id.* at 662. Although various cases have stated that public universities are branches of government coequal with the Legislature, the constitution does not contain any provision that elevates them to a fourth branch of government. See *Walker v Wolverine Fabricating Mfg Co, Inc*, 425 Mich 586, 607; 391 NW2d 286 (1986).[3] Because autonomous state universities have not

---

[2] We note that the Legislature recently passed a bill permitting universities to conduct presidential searches in more secrecy. 1996 PA 464.

[3] The framers of Michigan's constitution have eschewed creating a fourth branch of government, which would be "contrary to the genius of republican government." *Civil Service Comm v Auditor General*, 302 Mich 673, 682; 5 NW2d 536 (1942), quoting *Colbert v State*, 86 Miss 769, 775; 39 So 65 (1905).

achieved that status under the constitution, *In re 1976 PA 267* is inapplicable to this case.

We, therefore, hold that the OMA may be constitutionally applied to constitutionally established universities in their selection of a president. The trial court's finding to the contrary is reversed.

Plaintiff next argues that the trial court erred in finding that the PSC was not a "public body" under the OMA and that, therefore, there was no violation of the OMA. We agree. Under a plain reading of the OMA and the decision of the Court in *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*, 444 Mich 211; 507 NW2d 422 (1993), the PSC was a "public body" and, as such, violated the OMA when it conducted closed interviews of candidates.

MCL 15.262(a); MSA 4.1800(12)(a) contains the following definition:

> "Public body" means any state or local legislative or governing body, including a board, commission, *committee, subcommittee*, authority, or council, *which is empowered* by state constitution, statute, charter, ordinance, *resolution*, or rule *to exercise governmental or proprietary authority or perform a governmental or proprietary function*, or a lessee thereof performing an essential public purpose and function pursuant to a lease agreement. [Emphasis supplied.]

MCL 15.262(d); MSA 4.1800(12)(d) defines "decision" as

> a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy.

MCL 15.263(2); MSA 4.1800(13)(2) provides that all decisions of a public body are to be made at meetings open to the public.

A straightforward reading of the OMA leads to the conclusion that the PSC was subject to it. The PSC was a committee or subcommittee that was empowered by resolution to exercise portions of the governmental authority of the board of trustees in its job of selecting a university president. The trial court erred in finding that the narrowing of the field of candidates for the position was a ministerial function. Perhaps if the PSC had only reviewed applications to determine if the candidates met some minimum standards, its work would have been ministerial in nature. However, the PSC did not limit its activities in such a way. Instead, it reviewed and studied the candidates and reduced greatly the number to be considered by the whole board. The parties agree that the original number of candidates was reduced from more than 150 to eventually four. The actions taken in such a winnowing process were more than ministerial in nature and constituted a "decision" under the OMA.

In addition to the activities involved in reducing the number of candidates to be considered by the board of trustees, the PSC also conducted private interviews of potential finalists, which is a violation of MCL 15.268(f); MSA 4.1800(18)(f).[4] This section forbids the conducting of any private interviews and even provides that the specific contents of an application cannot be reviewed privately unless the applicant has requested confidentiality. There was no showing by

---

[4] But see footnote 2, *supra.*

defendant that all the applications reviewed by the PSC were of candidates who requested confidentiality.

Although defendant argues that the PSC could not be a "public body" because it could not have a "meeting" as defined under the OMA, such argument is unpersuasive. Under the OMA, once a committee is determined to be a "public body," any meeting of a quorum of *that* public body would be a meeting under the OMA. Therefore, in this instance, the PSC had four trustees and nine lay members, which would make a total of seven persons of either type a quorum of the entire body, or, if only trustees were considered, a quorum would be three trustees. However, as will be discussed below, even a subquorum committee has been found to be subject to this section of the OMA.

The above analysis of this situation is amply supported by the Court's interpretation of the OMA in *Booth Newspapers*. In *Booth Newspapers*, the Court found that the intent of the Legislature in enacting the OMA was to remedy the ineffectiveness of the 1968 legislation and to "promote a new era in governmental accountability." 444 Mich 222. The Court noted that in order to further the OMA's legislative purposes, this Court had historically construed the OMA broadly, "while strictly construing its exemptions and imposing on public bodies the burden of proving that an exemption exists." *Id.* at 223.

The Court found that the Board of Regents of the University of Michigan was a public body under the OMA. *Id.* at 225. It further found:

> The selection of a university president is one of the board's most important exercises of governmental authority. If it establishes any form of subcommittee and empowers that subcommittee by "resolution or rule" to exercise this

particular governmental authority, then that subcommittee
is also a "public body" within the meaning of the act. [*Id.*]

The board in *Booth Newspapers* argued that the
appointment of a one-person committee would not
fall under the OMA. The Court disagreed, stating:

> Essentially, the board argues form over substance. The
> Legislature did not grant any exception to specific types or
> forms of committees. Therefore, delegating the task of
> choosing a public university president to a one-man com-
> mittee, such as Regent Brown, would warrant the finding
> that this one-man task force was in fact a public body. [*Id.*
> at 226.]

The Court, therefore, held that selection of a presi-
dent, whether by a one-man committee, another com-
mittee, or the whole board, constituted the exercise
of governmental authority and that, whatever the
composition of that body, it was a public body under
the OMA. *Id.*

Defendant argues that the PSC is not a "public body"
under the reasoning in *Booth Newspapers* because in
that case the PSC consisted of the entire board, whose
members communicated with one another throughout
the entire procedure, rather than being established as
a separate body as in the case at bar. Defendant's
arguments ignore the plain statements by the Court in
*Booth Newspapers* that even a one-man committee
given the responsibility of reviewing applicants and
limiting the number to be finally interviewed by the
entire board is a "public body" exercising governmen-
tal authority. The PSC in this case presents an even
stronger argument for finding that it is a "public
body" because it was composed of fully one-half of
the members of the board of trustees and was given

the same authority as that given to the one-man committee in *Booth Newspapers*.

Defendant argues, as did the board in *Booth Newspapers*, that, because none of the decisions of the subquorum group bound the board, they were not "decisions" as defined in the OMA. The Court found that "any alleged distinction between the committee's consensus building and a determination or action, as advanced in the OMA's definition of 'decision,' is a distinction without a difference." *Id.* at 229. Again, the instant case presents a stronger showing of "decisions" being made because the discussions of the PSC went beyond consensus building to an actual reduction in the number of candidates and the presentation of finalists to the board.

In *Booth Newspapers*, the board argued that the exemption in § 8(f) of the OMA, MCL 15.268(f); MSA 4.1800(18)(f), allowing closed sessions to review specific contents of applications for employment, permitted it to hold closed sessions for discussion of the candidates' qualifications and for reducing the list of candidates. 444 Mich 230. The Court found that the selection committee was required to make any reduction decisions in public and that there was no statutory exception that would permit a subcommittee to conduct closed interviews. *Id.* at 230-231. It stated that the Legislature, in mandating open interviews, must have known that, at that point, candidates' identities would become known and that it was in the public's interest for their identities to become known at that point. *Id.* at 231.

Under the reasoning of the majority in *Booth Newspapers* and under a straightforward reading of the OMA, the PSC was a public body that violated the OMA

when it took steps to reduce the number of candidates in private session, when it reviewed applications of persons not requesting confidentiality, and when it interviewed applicants in private. Therefore, the trial court's finding that the PSC was not a public body is reversed.

In view of the above discussion, it is unnecessary to address plaintiff's argument that the individual conversations that occurred between the various trustees amounted to a constructive quorum in violation of the OMA. However, this Court notes that the record does not show the kind of consensus-building conversations in this case that were present in *Booth Newspapers*. Although one of the trustees was clearly lobbying for McPherson and one other candidate, there is no evidence in the record that any trustee committed to voting for any specific candidate before the holding of the public meeting.

Plaintiff's argument that defendant violated the notice requirements of the OMA is not preserved for appeal because it was not addressed by the trial court. *Richmond Twp v Erbes*, 195 Mich App 210, 219; 489 NW2d 504 (1992). However, we find that defendant substantially complied with the notice requirements when the notice was posted more than the required eighteen hours before the meeting even if it was actually accessible for only eleven hours. *Arnold Transit Co v Mackinac Island*, 99 Mich App 266, 274; 297 NW2d 904 (1980). In particular, defendant did not deliberately try to hold its meeting in secret, plaintiff was not in fact denied notice of the meeting, and the media were in attendance at the meeting.

Finally, plaintiff argues that the delegation of discretionary authority to the PSC constituted an unlaw-

ful delegation of the board's constitutional authority to select a president. The trial court found that the board could properly delegate ministerial duties to the PSC. While we disagree that only ministerial duties were delegated, we affirm the decision of the trial court. Defendant cannot delegate the power to select a president to another body or person. *Blanchard v Lansing Community College*, 142 Mich App 446; 370 NW2d 23 (1985); *Sittler v Michigan College of Mining & Technology Bd of Control*, 333 Mich 681; 53 NW2d 681 (1952). If the board had delegated the authority to actually select the president to the PSC, that would be a clearly unlawful delegation of power. However, the board, while giving the PSC more than mere ministerial duties, did not grant it the ultimate authority granted only to the board. In fact, the board retained its ability to accept or reject any candidates recommended by the PSC and to add names not considered by the PSC. Because the board did not give the ultimate authority to the PSC, the delegation was lawful.

Reversed in part; affirmed in part.

NEFF, P.J., concurred.

C. A. NELSON, J., *(dissenting)*. The statement of facts by the majority is accepted as framing the issues. The trial court granted defendant's motion for summary disposition, finding, among other things, that the Open Meetings Act (OMA) could not be constitutionally applied to the selection of a president for a university established under Const 1963, art 8, §§ 4 and 5. In particular, the trial court stated that it accepted and adopted the reasoning of Justice RILEY, joined by Justice GRIFFIN, in her dissent in *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*,

444 Mich 211, 251-267; 507 NW2d 422 (1993), wherein she found that the OMA could not be constitutionally applied to the selection of a state university president. I agree.

When reviewing constitutional provisions, the objective of such review is to give effect to the intent of the people who adopted the constitution. *Livingston Co v Dep't of Management & Budget*, 430 Mich 635, 641-642; 425 NW2d 65 (1988); *Macomb Co Taxpayers Ass'n v L'Anse Creuse Public Schools*, 213 Mich App 71, 78; 540 NW2d 684 (1995). In discerning such intent, we look at the circumstances surrounding the adoption of the provision and the purpose sought to be accomplished by its enactment. *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971). However, the primary source of understanding the constitution is its plain meaning as understood by the people who voted for it. *Livingston Co, supra.* Constitutional language is to be read according to its natural, common, and most obvious meaning. *Macomb Co, supra.* Courts may place themselves in the position of framers of the constitution to ascertain its meaning at that time. *Committee for Constitutional Reform v Secretary of State*, 425 Mich 336, 342; 389 NW2d 430 (1986). Reliance on the records of the constitutional convention is warranted only if the language of the constitution is unclear or if there is a "recurring thread of explanation binding together the whole of a constitutional concept." *Regents of the Univ of Michigan v Michigan*, 395 Mich 52, 60; 235 NW2d 1 (1975). Due deference is to be given to contemporaneous or longstanding interpretations of the constitution by the Michigan

Supreme Court. *McPherson v Secretary of State,* 92 Mich 377, 383; 52 NW 469 (1892).

At issue in this appeal is whether the language in Const 1963, art 8, §§ 4 and 5 should be interpreted to bar application of the OMA to the selection of a president for a state university. Article 8, § 5, in pertinent part, states:

> [T]he trustees of Michigan State University and their successors in office shall constitute a body corporate known as the Board of Trustees of Michigan State University . . . . Each board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds. Each Board shall, as often as necessary, elect a president of the institution under its supervision. He shall be the principal executive officer of the institution, be ex officio a member of the board without the right to vote and preside at meetings of the board. The board of each institution shall consist of eight members who shall hold office for terms of eight years and who shall be elected as provided by law. The governor shall fill board vacancies by appointment. Each appointee shall hold office until a successor has been nominated and elected as provided by law.

Article 8, § 4, in pertinent part, states, with respect to all state universities established by law:

> The legislature shall be given an annual accounting of all income and expenditures by each of these educational institutions. Formal sessions of governing boards of such institutions shall be open to the public.

Historically, the Court has found the Board of Regents of the University of Michigan to be a distinct governmental body that is coequal with the Legislature. *Sterling v Univ of Michigan Regents,* 110 Mich 369; 68 NW 253 (1896); *Weinberg v Regents of University of Michigan,* 97 Mich 246; 56 NW 605 (1893),

overruled in *W T Andrew Co, Inc v Mid-State Surety Corp*, 450 Mich 655, 669; 545 NW2d 351 (1996)[1] In these cases, the Court refused to apply acts of the Legislature to the University of Michigan because the Constitution of 1850 had given controlling power over the university and its property to the regents. The Court in *Sterling* stated that the basis of the majority opinion in *Weinberg* was that "the board of regents is a constitutional body, charged by the Constitution with the entire control of that institution." *Sterling, supra* at 381-382. The Court reasoned that, where the constitution directly conferred a power upon one constitutional body (the regents of the university), it necessarily excluded the existence of that power in the other constitutional body (the Legislature) unless the constitution contained language indicating a contrary intent. *Id.* at 382. Michigan State University has followed a parallel course of constitutional maturity. *Regents of the Univ of Michigan v Michigan*, 166 Mich App 314; 419 NW2d 773 (1988).

Plaintiff argues that the majority opinion in *Booth* supports its argument that the OMA can be constitutionally applied to defendant. I disagree. The majority explicitly refused to consider the question of constitutionality in that case because it had not been preserved for appeal. 444 Mich 234-235.

---

[1] Although the Court overruled *Weinberg* in *W T Andrews Co*, it did so on the basis that the bond statute minimally affected the university and that the statute was a proper exercise of the police power of the Legislature in order to protect the general welfare of society. However, it did so while affirming that the "University of Michigan is constitutionally created and its board of regents possesses complete power over financial decisions affecting the university." 450 Mich 662. Therefore, the basic underpinnings of *Weinberg* were affirmed even though the ultimate result was overruled.

Plaintiff argues that the OMA is merely an implementation of the requirement of Const 1963, art 8, § 4 that the board hold "formal" sessions in public. As Justice RILEY opines, "the exclusionary language of 'formal' reveals the decision whether informal meetings shall be held publicly is vested in the regents." *Booth, supra* at 265. In so stating, Justice RILEY reviewed the record of the constitutional convention of 1961 in which it was stated that, at that time, the public and the news media were only present at board meetings as a matter of sufferance. *Id.* Neither plaintiff in the present suit nor the plaintiffs in *Booth* suggest that the then-existing practice was to allow the press to accompany regents on interviews for possible presidential candidates, nor do they suggest that such practice was even considered at the adoption of the constitution." *Id.,* n 26. I agree with Justice RILEY's conclusion that the mandate in Const 1963, art 8, § 4 that "formal" sessions be held in public suggests that "informal" sessions do not need to be held in public.

The question then becomes who defines "formal." Because the constitution does not define the term, the argument that the OMA could provide the definition has some credence. However, given the history behind the constitutional provision and given what the public was used to as "formal" sessions at that time, Justice RILEY's formulation is more in line with constitutional construction. In other words, the people who enacted the constitution would expect the same "formal" sessions to be open to the public as were open at that time. At that time, the governing boards of the universities determined which meetings were to be open to the public. Using the rules of constitutional construction, we will not interfere with the

board's determination regarding which sessions are to be "formal."

Plaintiff and the Attorney General argue that the public policy underlying the OMA can provide a means of limiting the autonomy granted defendant under the constitution. They argue that, even in matters of autonomy such as educational and fiscal matters, limitations can be imposed to implement or protect public policy. They further argue that the OMA is not an impermissible intrusion on an independent branch of government. Although I find their arguments to have some persuasive weight, I ultimately disagree.

In support of their argument, plaintiff cites *Glass v Dudley Paper Co*, 365 Mich 227; 112 NW2d 489 (1961), which held that the Court of Claims Act could be applied to claims against public universities because universities were not given the constitutional power to set the jurisdiction of the various courts of the state. The Court found that the Court of Claims Act did not invade the power of the university to control the affairs and property of the university. *Id.* at 229. This result is obvious, because the Court of Claims Act simply sets forth the court in which this constitutional corporation could be sued. It did not in any way control any of the affairs of the university.

Plaintiff also cites *Regents of Univ of Michigan v Employment Relations Comm*, 389 Mich 96; 204 NW2d 218 (1973). In that case, the Court found that the Michigan Public Employees Relations Act (PERA) could be constitutionally applied to state universities without violating their autonomy. *Id.* at 108. However, because the boards of the universities were given control over educational matters by the constitution, the employees of the university would not be able to

negotiate on all aspects of their employment. *Id.* at 109. As an example, the Court stated that if interns at the University of Michigan wanted to bargain to discontinue an aspect of their job, they could not do so if the administrators of the school felt that that aspect was a necessary part of the education of interns. *Id.* Therefore, the PERA was applied to public universities, but limited in its scope.

Plaintiff also cites *Branum v Univ of Michigan Bd of Regents*, 5 Mich App 134; 145 NW2d 860 (1966). In *Branum*, this Court found that historically the Board of Regents of the University of Michigan has "not been held subject to the control of the legislature," *id.* at 137, and that the board of regents must have the same freedom from control "in educational matters in order to provide the highest quality education." *Id.* at 138. This Court stated that, outside the confines of the operation and allocation of funds, the regents were subject to the "clearly established public policy of the people of Michigan." *Id.* at 139. That case involved the waiver of the defense of governmental immunity in a tort action. As a result, it is distinguishable because that case did not involve the actual operation of the university, unlike the present case that does involve an operation of the university that goes to the heart of providing "the highest quality education."

Plaintiff also points to *Regents of Univ of Michigan v Labor Mediation Bd*, 18 Mich App 485; 171 NW2d 477 (1969), wherein this Court found that the university was subject to the general laws of the state. However, that case did not involve a power that was specifically enumerated in the constitution. Further, in *Sprik v Regents of Univ of Michigan*, 43 Mich App

178; 204 NW2d 62 (1972), this Court concluded that, once the state appropriated funds to the university, only the regents can direct how the funds will be spent. However, this Court also stated that the state may place conditions on state appropriations that, if the university accepts the money, are binding on the university as long as the conditions do not interfere with the regents' management of the university. *Id.* at 187. Any conditions imposed can only be applied to state-appropriated money. *Id.* Thus, *Sprik* is distinguishable because it leaves the decision of whether to accept the conditions with the board, i.e., it has the ultimate power.

While raising many of the same arguments as plaintiff, the Attorney General also sets forth the argument that the courts have long recognized the importance of the underlying, clear public policy promoted by the OMA. He argues that it is the clear public policy of this state to promote openness in government. The Attorney General concludes that, because the OMA does not interfere with the board's decision in selecting a president, it does not interfere with the constitutional autonomy of the board. Therefore, a review of the purpose behind the OMA is in order.

The title of the OMA, 1976 PA 267, sets forth its purpose, providing:

> AN ACT to require certain meetings of certain public bodies to be open to the public; to require notice and the keeping of minutes of meetings, to provide for enforcement; to provide for invalidation of governmental decisions under certain circumstances; to provide penalties; and to repeal certain acts and parts of acts.

This Court has previously found that the purpose of the OMA is to "provide the public with fuller disclosure of the acts of government officials." *Rochester Community Schools Bd of Ed v State Bd of Ed*, 104 Mich App 569, 582; 305 NW2d 541 (1981). Because the purpose of the OMA is to promote openness in government, it is given a broad interpretation. *Detroit News, Inc v Detroit*, 185 Mich App 296; 460 NW2d 312 (1990). "Sunshine laws" were adopted as early as 1895 in Michigan. *Wexford Co Prosecutor v Pranger*, 83 Mich App 197, 201, n 5; 268 NW2d 344 (1978). The purpose behind sunshine laws such as the OMA is to prevent the real and imminent danger of irreparable injury when governmental bodies act in secret. *Id.*

The longstanding public policy of this state to open the act of governmental officials to public scrutiny would seem to support the conclusion that the OMA can be constitutionally applied to universities as public policy because it does not tell the boards whom to select as president, does not tell them what the criteria should be for that selection, and does not tell them how to select a president. However, defendant argues that such public meetings interfere with the constitutional grant of the power to select a president because it results in good candidates withdrawing their names from consideration. Defendant also argues that because the Supreme Court found that the OMA could not be constitutionally applied to the Court in *In Re 1976 PA 267*, 400 Mich 660; 255 NW2d 635 (1977), it likewise could not be applied to public universities, which have been found to be coequal branches of government.

As discussed at the beginning of this opinion, the Michigan Supreme Court has consistently found pub-

lic universities to be independent constitutional cor-
porations coequal with the Legislature. Defendant is
explicitly given the power to choose a president by
the constitution, and the constitution only mandates
that "formal" sessions of the boards be open to the
public. Because the Michigan Supreme Court found
that the OMA could not be applied to it with regard to
its constitutionally derived powers, because the
authority to select a president is a constitutionally
enumerated power ("Each board shall . . . elect a
president of the institution . . . ." Const 1963, art 8,
§ 5), and because public universities have been found
to be coequal to the other branches of government, I
conclude that the trial court correctly found that the
OMA cannot be constitutionally applied to defendant's
presidential selection process. Any public policy of
the OMA must give way to this constitutional mandate
that has as a part of its purpose to select a person
who will enable the institution to provide "the highest
quality education." This can best be obtained by
allowing all possible candidates to be reviewed,
including those who would be adversely affected by
publicity.

Because the constitutional issue is dispositive, it is
unnecessary to review the remaining issues raised by
the parties. Thus, I respectfully dissent from the
majority opinion.