FEDERATED PUBLICATIONS, INC v
MICHIGAN STATE UNIVERSITY BOARD OF TRUSTEES

Docket No. 109663. Argued January 22, 1999 (Calendar No. 11). Decided
June 15, 1999.

Federated Publications, Inc., doing business as the Lansing State Jour-
nal, and the Detroit News, Inc., brought an action in the Ingham
Circuit Court against the Board of Trustees of Michigan State Uni-
versity, seeking to enjoin the university's presidential search com-
mittee from conducting private meetings. The court, James R. Gid-
dings, J., denied a preliminary injunction and the plaintiffs' motion
to compel identification of candidates under consideration, and
granted summary disposition for the university, concluding that the
committee was not a public body subject to the Open Meetings Act,
that application of the OMA to the presidential search is unconstitu-
tional, and that the university did not unlawfully delegate its consti-
tutional authority. The Court of Appeals, FITZGERALD, J., and NEFF,
P.J. (C. A. NELSON, J., dissenting), reversed. 221 Mich App 103
(1997) (Docket No. 177264). The university appeals.

In an opinion by Justice CORRIGAN, joined by Chief Justice
WEAVER, and Justices BRICKLEY, TAYLOR, and YOUNG, the Supreme
Court held:

The Legislature does not have power to regulate open meetings
for the defendant in the context of presidential searches, i.e., it is
institutionally unable to craft an open meetings act that would not,
in the context of a presidential selection committee, unconstitu-
tionally infringe the governing board's power to supervise the
institution.

1. Const 1963, art 8, § 5 grants the defendant broad authority
over the management and control of Michigan State University,
including the power to elect the president of the university. Const
1963, art 8, § 4, however, restricts the board's power to dictate its
procedure, directing that formal sessions of the governing boards
of such institutions are to be open to the public. That the provision
is limited to formal sessions, rather than all sessions, signifies that
the governing boards retain their power to decide whether to hold
informal sessions in public.

2. Under Const 1963, art 8, § 4, the defendant's presidential selection process need not have been open to the public except when conducted at a formal session of the board. Application of the Open Meetings Act cannot rest on the absence in the constitution of a definition of "formal sessions." Such an application to the committee simply is an impermissible intrusion on the defendant's constitutional authority to supervise the institution.

Reversed.

Justice CAVANAGH, concurring in part and dissenting in part, stated that while the OMA was violated by the search proceeding undertaken by the defendant, when applied to the facts of this case, the OMA unconstitutionally invades the province of the defendant board to hold less than formal meetings in a closed setting. Given the language and history of Const 1963, art 8, § 4, it appears that the framers constitutionally required formal meetings of university governing boards to be open, and by this action indicated that meetings of a less than formal nature could be held in a closed setting. Thus, a legislative enactment such as the OMA must fail.

Justice KELLY, dissenting, stated that the search committee was a public body under the Open Meetings Act and, therefore, the OMA applied to its activities.

Once a committee is determined to be a public body, a meeting of a quorum of that body is subject to the act. Both the reasoning of *Booth Newspapers, Inc v Univ of Michigan Bd of Regents,* 444 Mich 211 (1993), and a straightforward reading of the OMA indicate that the presidential search committee was a public body. As such, the committee violated the OMA when it reduced the number of candidates in private session, when it reviewed applications, and when it interviewed applicants in private.

Although state universities are unquestionably distinct governmental bodies, coequal with the Legislature, they have not been held constitutionally immune from all regulation by the Legislature. Statutes designed for the benefit of society as a whole can be imposed on a constitutionally created university when they pose no direct threat to the university's financial autonomy. While the Legislature may not interfere with the management and control of universities, the OMA does not infringe the defendant's constitutional power to supervise the institution. It is not aimed at any activities peculiar to the university and does not attempt to change or disturb its educational activities. Although it requires that the process of selecting a university president be done in public, it does not tell the board what the criteria should be for selection. Nor does it dictate the process or the person to be selected. What it does require is that the university function in public meetings when interviewing

candidates and when making a detailed review of applications. This requirement does not divest the board of its authority to select a president or infringe the board's constitutional power to supervise the university. State-financed universities are public institutions that must function within the confines of state laws.

*Foster, Swift, Collins & Smith, P.C.* (by *Charles E. Barbieri* and *Webb A. Smith*), for plaintiff-appellee.

*Roderick K. Daane* and *Robert A. Noto* for defendant-appellant.

Amici Curiae:

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Kelly Keenan*, Assistant in Charge, FOI Division, for Attorney General.

*Law Offices of Dawn Phillips Hertz* (by *Dawn Phillips Hertz* and *Lisa Rycus Mikalonis*) for Michigan Press Association and The State News.

*Miller, Canfield, Paddock & Stone, P.L.C.* (by *Charles A. Duerr, Jr.*), by authority and on behalf of attorneys *Elizabeth M. Barry, Louis A. Lessem, Susan Gerrits, Kenneth A. McKanders, Eileen K. Jennings,* and *Scott Hill-Kennedy* and *Fredric N. Goldberg,* for state universities University of Michigan Regents, Wayne State University Board of Governors, Oakland University Board of Trustees, Eastern Michigan University Board of Regents, Central Michigan University, and Ferris State University Board of Trustees, respectively.

*Honigman, Miller, Schwartz & Cohn* (by *Herschel P. Fink* and *Jennifer S. Zbytowski*) for Detroit Free Press, Inc.

CORRIGAN, J. We granted leave in this case to determine whether the presidential selection procedure utilized by defendant violated the Open Meetings Act (OMA), MCL 15.261 *et seq.*;   MSA 4.1800(11) *et seq.*, and whether application of the OMA to committees formed by the governing boards of our public universities to assist in the selection of university presidents is constitutional. As an initial matter, while we would customarily begin our analysis with a discussion of whether the OMA was violated by the conduct of the board of trustees,[1] we are bypassing that question and moving directly to the constitutional question because the OMA cannot be a restraint upon the actions of defendant in this circumstance. As explained below, we hold that the Legislature does not have power to regulate open meetings for defendant in the context of presidential searches at all, i.e., the Legislature is institutionally unable to craft an open meetings act that would not, in the context of a presidential selection committee, unconstitutionally infringe the governing board's power to supervise the institution. We therefore reverse the Court of Appeals decision and reinstate the trial court's order granting summary disposition for defendant.

I

John DiBiaggio resigned as president of Michigan State University during the summer of 1992. Defendant appointed Gordon Guyer interim president and thereafter formed a presidential search committee (PSC), consisting of the eight university trustees and

---

[1] See *Taylor v Auditor General*, 360 Mich 146, 154; 103 NW2d 769 (1960).

nine additional members, to assist it in selecting a new president. The PSC developed a statement of qualifications and proceeded to identify potential candidates to meet its charge of recommending final candidates to defendant by July 1, 1993.[2] The search process, however, ground to a halt when the MSU student

---

[2] Defendant charged the PSC as follows:

The Presidential Search Committee shall recommend to the Board of Trustees by July 1, 1993 a slate of final candidates for President of Michigan State University. The Board of Trustees will select and appoint the President.

Members of the University community (trustees, faculty, staff, alumni, and students) and other persons interested in the University must submit the name of any person they wish considered as a prospect, nominee, or applicant to the Search Committee for review. The Search Committee shall not eliminate a candidate from consideration until such time as a President has been selected. The Board may add to the list of final candidates individuals reviewed by the Search Committee and not included in the list of final candidates by the Search Committee.

In carrying out its responsibilities the Presidential Search Committee shall:

1. Solicit comments from interested parties on the needs of the University and the qualifications for the next President.

2. Hold public hearings on the needs of the University and the qualifications for the next President.

3. Develop a statement of the needs of the University and the qualifications of the next President to be used to recruit, screen, interview, and evaluate candidates. . . .

4. Actively solicit nominations and applications from a diverse group of well-qualified persons.

5. Develop rules and procedures for the Search Committee to receive nominations and applications, screen candidates, check references, evaluate candidates, interview candidates, and recommend candidates to the Board of Trustees.

6. Carry out the University's commitment to principles and policies of pluralism and diversity.

7. Carry out the search in a manner that will enhance the stature of Michigan State University.

8. Observe the requirements of Michigan's Open Meetings Act and Freedom of Information Act.

9. Respect the confidentiality of candidates to the extent permitted by law.

newspaper, the State News, published a confidential
list of over one hundred nominees under considera-
tion for the presidency. In response, defendant recon-
stituted the psc to consist of four trustees and the
nine nontrustee members. The psc then continued its
search in private.

The psc gathered and reviewed information regard-
ing the candidates, eventually selecting fifteen to
interview. After completing the interviews, the psc
recommended four candidates to defendant. Defend-
ant released the names of these candidates to the
public. One candidate eventually withdrew, and
defendant publicly interviewed the others. Two candi-
dates withdrew after their interviews. Defendant con-
sidered the remaining candidate at a July 27, 1993,
meeting, but the trustees were evenly divided regard-
ing her candidacy.

Unable to reach a decision to elect the sole remain-
ing candidate, defendant requested that the psc recon-
vene and recommend additional candidates. The psc
declined to recommend other candidates. Defendant's
chairman then contacted M. Peter McPherson, a can-
didate who had withdrawn his name from considera-
tion after his interview with the psc, and urged him to
reinstate his candidacy. McPherson agreed. Defendant
publicly interviewed him on August 17, 1993, and
subsequently elected him president.

---

10. Inform the Board of Trustees, the University community, and
the media about the progress of the search.

11. Coordinate efforts with those of the consultants of Heidrick
and Struggles Inc. who have been retained by msu to assist in the
search.

12. The Search Committee will be discharged by action of the
Board upon completion of its responsibilities.

Plaintiffs commenced this action shortly after defendant reconstituted the PSC, but the trial court denied their motion for a preliminary injunction.[3] The parties continued discovery after the conclusion of the search and eventually filed cross-motions for summary disposition. The trial court granted defendant's motion and denied plaintiffs' motion, concluding that the PSC was not a public body subject to the OMA, that application of the OMA to the presidential search is unconstitutional, and that defendant did not unlawfully delegate its constitutional authority. The Court of Appeals reversed.[4]

The Court of Appeals reasoned that, although courts have held that Michigan public universities are distinct governmental bodies, coequal with the Legislature, they are not constitutionally immune from all regulation by the Legislature. The Court then concluded that the policy of promoting openness in government that underlies the OMA supported application of the act to state universities:

> The longstanding public policy of this state to open the acts of governmental officials to public scrutiny supports the conclusion that the OMA can be constitutionally applied to universities. The OMA is not aimed at any activities peculiar to the university and does not attempt to change or disturb its educational activities. In fact, the effect of the OMA with respect to public universities is minimal. Although it requires that much of the process of selecting a university president be done in public, it does not tell the board what

---

[3] The Court of Appeals denied plaintiffs' application for leave to appeal the interlocutory order and dismissed their motion for peremptory reversal. Unpublished order entered June 18, 1993 (Docket No. 165288). This Court denied plaintiffs' subsequent application for leave to appeal. 443 Mich 869 (1993).

[4] 221 Mich App 103; 561 NW2d 433 (1997).

the criteria should be for that selection, how to select a candidate, or whom to select as president. It merely requires that, when interviewing candidates and when making a detailed review of applications of candidates who do not request confidentiality, the university function in public meetings. It does not divest the board of its authority to select a president. [221 Mich App 103, 112; 561 NW2d 433 (1997).]

The Court of Appeals also determined that the PSC violated the OMA during its search process. The Court reasoned that the PSC was a "public body" for purposes of the OMA because defendant empowered it by resolution to exercise portions of defendant's governmental authority in selecting a president. The Court determined that the PSC violated the OMA "when it took steps to reduce the number of candidates in private session, when it reviewed applications of persons not requesting confidentiality, and when it interviewed applicants in private." *Id.* at 119. Finally, the Court rejected plaintiffs' argument that defendant unlawfully delegated its constitutional authority to select a president because defendant, while giving the PSC more than ministerial duties, retained its ultimate authority.[5]

This Court granted defendant's application for leave to appeal.[6]

II

We address today the constitutional question left open by *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*, 444 Mich 211, 235-236; 507 NW2d 422

---

[5] Judge C. A. NELSON dissented, concluding that the OMA could not be constitutionally applied to the selection of a state university president.

[6] 458 Mich 865 (1998).

(1993),[7] and conclude that application of the OMA to committees formed by governing boards of public universities to assist in the selection of university presidents is unconstitutional.

A

The Michigan Constitution is a limitation on the Legislature's power, not a grant of power to it. *Advisory Opinion on Constitutionality of 1976 PA 240*, 400 Mich 311, 317-318; 254 NW2d 544 (1977). As this Court explained in *In re Brewster Street Housing Site*, 291 Mich 313, 332-333; 289 NW 493 (1939):

> By the Declaration of Independence, all political connection between the colonies and the State of Great Britain was declared to be dissolved and the colonies asserted to be free and independent States. The several States, when organized, succeeded to all of the legislative powers within their respective territorial jurisdictions possessed by the Parliament of England, and as such free and independent States they still possess those powers, except insofar as they have been delegated by the States to the Federal government by the Constitution of the United States or voluntarily restrained by the people through the Constitution of the State.

Thus, absent a constitutional limitation, the Legislature has the power to legislate within a particular field. See *Advisory Opinion 1976 PA 240, supra* at 318; *Oakland Co Taxpayers' League v Oakland Co Supervisors*, 355 Mich 305, 323; 94 NW2d 875 (1959); *Brewster Street, supra* at 333. In this case, we revisit

---

[7] The dissent in *Booth, supra* at 251, reached the constitutional question, concluding that application of the OMA in this context is unconstitutional.

the question of the scope of the Legislature's power
to regulate public universities.

B

The Michigan Constitution confers a unique consti-
tutional status on our public universities and their
governing boards.[8] Const 1963, art 8, §§ 5, 6. Const
1963, art 8, § 5 grants defendant broad authority over
Michigan State University, including the power to
elect the president of the university:

> [T]he trustees of Michigan State University and their suc-
> cessors in office shall constitute a body corporate known as
> the Board of Trustees of Michigan State University . . . .
> Each board shall have general supervision of its institution
> and the control and direction of all expenditures from the
> institution's funds. Each board shall, as often as necessary,
> elect a president of the institution under its supervision. He
> shall be the principal executive officer of the institution, be
> ex-officio a member of the board without the right to vote
> and preside at meetings of the board.

Const 1963, art 8, § 4, however, restricts the board's
power to dictate its procedure, directing that
"[f]ormal sessions of governing boards of such institu-
tions shall be open to the public."

In construing provisions of our constitution, the
primary rule is that of "common understanding."
*Council of Organizations & Others for Education
About Parochiaid, Inc v Governor*, 455 Mich 557, 569;

---

[8] This Court has described the governing boards' status as "the highest
form of juristic person known to the law, a constitutional corporation of
independent authority, which, within the scope of its functions, is co-
ordinate with and equal to that of the legislature." *Bd of Regents of the
Univ of Michigan v Auditor General*, 167 Mich 444, 450; 132 NW 1037
(1911).

566 NW2d 208 (1997). In *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971), this Court embraced Justice COOLEY's explanation of this principle in his treatise, 1 Cooley, Constitutional Limitations (6th ed), p 81:

> A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed." (Emphasis added.)

To clarify meaning, we often consider the circumstances surrounding the adoption of the provision and the purpose it is designed to accomplish. *Bolt v City of Lansing*, 459 Mich 152, 160; 587 NW2d 264 (1998). Thus, we turn to the historical origins of Const 1963, art 8, §§ 4, 5  to discern the limits they place on the Legislature's power to regulate our public universities.

C

Long ago, the Legislature controlled and managed our first public university, the University of Michigan. Const 1835, art 10, § 5; see *Regents of the Univ of Michigan v Michigan*, 395 Mich 52, 63; 235 NW2d 1 (1975). This experiment failed, prompting extensive debate regarding the future of the university at the Constitutional Convention of 1850. *Sterling v Regents of Univ of Michigan*, 110 Mich 369, 374-378; 68 NW

253 (1896). Const 1850, art 13, § 8 emerged from these debates, divesting the Legislature of its power to regulate the university and placing control in an elected board. *Id.* at 377-380. The provision granted the board "the general supervision of the university, and the direction and control of all expenditures . . . ." The Constitution of 1850 also granted the board the power to elect a president of the university. *Id.*

The University of Michigan thrived under the leadership of its board of regents. *Sterling, supra* at 377. Recognizing the importance of an independent governing board in managing state colleges and universities, Const 1908, art 11, §§ 7, 8 vested control of the then-named Michigan Agricultural College in the State Board of Agriculture.[9] *State Bd of Agriculture v Auditor General,* 226 Mich 417, 424; 197 NW 160 (1924); *State Bd of Agriculture v Auditor General,* 180 Mich 349, 359; 147 NW 529 (1914); *Bauer v State Bd of Agriculture,* 164 Mich 415; 129 NW 713 (1911). Const 1963, art 8, § 5 combined the separate provisions of the Constitution of 1908 into one provision, granting the respective governing bodies control over the University of Michigan, Michigan State University, and Wayne State University.[10] The current provision draws its language from Const 1850, art 13, § 8.

This Court has long recognized that Const 1963, art 8, § 5 and the analogous provisions of our previous

---

[9] Defendant came into existence by constitutional amendment in 1959. 1959 PA JR No 2. The Legislature changed the name of defendant's institution to Michigan State University in 1963. 1963 (2nd Ex Sess) PA 50.

[10] The people granted constitutional status to Wayne State University in 1959. 1959 PA JR No 3. Const 1963, art 8, § 6, confers constitutional status on our other public universities, but provides for appointed, rather than elected, governing boards.

constitutions limit the Legislature's power.[11] "[T]he Legislature may not interfere with the management and control of" universities. *Regents, supra* at 395 Mich 65. The constitution grants the governing boards authority over "the absolute management of the University, and the exclusive control of all funds received for its use." *Bd of Agriculture, supra* at 226 Mich 424. This Court has "jealously guarded" these powers from legislative interference. *Bd of Control of Eastern Michigan Univ v Labor Mediation Bd*, 384 Mich 561, 565; 184 NW2d 921 (1971).

This Court has not, however, held that universities are exempt from all regulation. In *Regents of the Univ of Michigan v Employment Relations Comm*, 389 Mich 96, 108; 204 NW2d 218 (1973), we quoted *Branum v Bd of Regents of the Univ of Michigan*, 5 Mich App 134, 138-139; 145 NW2d 860 (1966):

> It is the opinion of this Court that the legislature can validly exercise its police power for the welfare of the people of this State, and a constitutional corporation such as the board of regents of the University of Michigan can lawfully be affected thereby. The University of Michigan is an independent branch of the government of the State of Michigan, but it is not an island. Within the confines of the operation and the allocation of funds of the University, it is supreme. Without those confines, however, there is no reason to allow the regents to use their independence to thwart the clearly established public policy of the people of Michigan.

Legislative regulation that clearly infringes on the university's educational or financial autonomy must, therefore, yield to the university's constitutional power. Thus, although a university is subject to the

---

[11] See, e.g., *Regents, supra* at 395 Mich 65; *Bd of Agriculture, supra* at 226 Mich 425; *Sterling, supra* at 380-384.

public employees relations act, MCL 423.201 *et seq.*; MSA 17.455(1) *et seq.*, the regulation cannot extend into the university's sphere of educational authority:

> Because of the unique nature of the University of Michigan . . . the scope of bargaining by [an association of interns, residents, and post-doctoral fellows] may be limited if the subject matter falls clearly within the educational sphere. Some conditions of employment may not be subject to collective bargaining because those particular facets of employment would interfere with the autonomy of the Regents. [*Regents, supra* at 389 Mich 109.]

See also *Central Michigan Univ Faculty Ass'n v Central Michigan Univ*, 404 Mich 268, 281-283; 273 NW2d 21 (1978). Similarly, although the Legislature may attach conditions to an appropriation, the conditions cannot invade university autonomy. *Bd of Agriculture, supra* at 226 Mich 425.

D

In this case, we do not consider a generally applicable law that implicates university financial autonomy. Rather, we consider a law that dictates the manner in which the university operates on a day-to-day basis. The authority of the governing board is derived from Const 1963, art 8, § 5, which states in pertinent part:

> Each board shall have general supervision of its institution . . . . Each board shall, as often as necessary, elect a president of the institution under its supervision.

We hold that the application of the OMA to the internal operations of the university in selecting a president infringes on defendant's constitutional power to supervise the institution. Const 1963, art 8, § 5.

Although a university is not a separate branch of government, our decision in *In re 1976 PA 267*, 400 Mich 660; 255 NW2d 635 (1977), is instructive. In that case, this Court held in a rare advisory opinion that the proposed OMA provision applying the act to this Court during its exercise of rulemaking authority and deliberations regarding administrative orders was unconstitutional:

> The judicial powers derived from the Constitution include rulemaking, supervisory and other administrative powers as well as traditional adjudicative ones. They have been exclusively entrusted to the judiciary by the Constitution and may not be diminished, exercised by, nor interfered with by the other branches of government without constitutional authorization. See *Attorney General ex rel Cook v O'Neill*, 280 Mich 649; 247 NW 445 (1937). It is our opinion that 1976 PA 267 is an impermissible intrusion into the most basic day-to-day exercise of the constitutionally derived judicial powers. [*Id.* at 663.]

Given the constitutional authority to supervise the institution generally, application of the OMA to the governing boards of our public universities is likewise beyond the realm of legislative authority. Const 1963, art 8, § 5.

That the OMA cannot constitutionally be applied to the defendant's presidential search committee is supported by the language of Const 1963, art 8, § 4.[12] The

---

[12] The concurrence does not explain how Const 1963, art 8, § 4, which applies only to the governing board, applies to a search committee that includes both members of the board and other members of the university community. Given its composition, it is wrong to characterize the meetings of the committee as meetings of the board. Our decision today rests on the board's supervisory power under Const 1963, art 8, § 5. Const 1963, art 8, § 4 guides us in determining whether Const 1963, art 8, § 5 grants the board the authority to decide whether to open meetings of the search committee to the public.

delegates to the Constitutional Convention of 1961 recognized that the decision whether to open meetings of university governing boards to the public lay within the boards' sphere of authority. Const 1963, art 8, § 4 restricted the boards' authority by requiring that "[f]ormal sessions of governing boards of such universities shall be open to the public." The author of the provision explained its purpose:

> Meetings of governing boards of the 3 major universities have been open to the public and news media for the past ½ dozen years and that has been accomplished only after a long period of negotiations. As it stands, the public and news media are present only as a matter of sufferance. They are invited guests of the governing board, an invitation which could be, conceivably, withdrawn at any time. . . . [N]ow that we are creating by constitutional enactment 7 more such governing boards, it would be appropriate that their formal meetings should be conducted in public sessions. [1 Official Record, Constitutional Convention 1961, p 1187.]

That the provision is limited to "formal sessions," rather than all sessions, signifies that the governing boards retain their power to decide whether to hold "informal" sessions in public. Const 1963, art 8, § 5, prohibits the Legislature from intruding in this basic day-to-day exercise of the boards' constitutional power. Nor can application of the OMA rest on the absence of a definition of "formal sessions" in the constitution. Unlike other provisions of the constitution, the Legislature is not delegated the task of defining the phrase "formal sessions" for purposes of Const 1963, art 8, § 4.[13]

---

[13] Compare Const 1963, art 5, §§ 28, 29, establishing the state transportation and civil rights commissions. See, generally, *Beech Grove Invest-*

The meetings of the PSC clearly were not "formal" sessions of defendant under the common understanding of that term.[14] Only four trustees were members of the PSC and participated in that phase of the presidential search. Under Const 1963, art 8, § 5, the governing board of the university, not the Legislature, has the power to open the meetings of a presidential search committee such as the instant one to the public. Application of the OMA to the PSC is simply an impermissible intrusion on defendant's constitutional authority to supervise the institution.[15]

---

*ment Co v Civil Rights Comm,* 380 Mich 405, 418-419; 157 NW2d 213 (1968) (plurality opinion), and 2 Official Record, Constitutional Convention 1961, pp 2673-2674, discussing the distinction between the phrases "provided by law" and "prescribed by law" as used in the constitution. The relevant provisions of Const 1963, art 8, §§ 4, 5, are not qualified by any such language.

[14] The Attorney General endeavored to define the phrase "formal sessions" in OAG, 1969-1970, No 4676, pp 73, 75 (August 13, 1969):

Meaning and effect can be given to the last sentence of Article VIII, Sec. 4 by interpreting the phrase "formal sessions" as meetings or sittings of the respective governing bodies held in accordance with established rules of such bodies for the transaction of business.

Therefore, . . . whenever the governing board of an educational institution of higher learning is convened in accordance with established rules of such body for the transaction of business, it must convene in public session to which the members of the public are to be admitted. Private or executive meetings not held in accordance with established rules or where no business of the board is transacted are not formal sessions.

The Attorney General's attempt to define the term reveals that the determination of what constitutes a "formal" or "informal" session lies within the governing boards' sphere of authority. This Court would apply the most deferential standard when reviewing the board's definition of "formal session," limited to determining whether it bears any relation to the purpose of Const 1963, art 8, § 4. See, generally, Graglia, United States v Lopez: *Judicial review under the Commerce Clause,* 74 Tex L R 719, 725-726 (1996).

[15] Plaintiffs' arguments regarding the policy reasons for requiring an open presidential search, and open government in general, are irrelevant

Under Const 1963, art 8, § 4, defendant's presidential selection process need not have been open to the public except when conducted at a formal session of the board, such as the session at which defendant elected President McPherson. Defendant complied with the constitutional provision in its selection of a university president.[16] Accordingly, we reverse the Court of Appeals decision and reinstate the trial court's order granting summary disposition for defendant.

WEAVER, C.J., and BRICKLEY, TAYLOR, and YOUNG, JJ., concurred with CORRIGAN, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). While I concur in the result reached by the majority, I am nonetheless in disagreement with both the route taken by the majority to reach that conclusion and the width of the path the majority elects to traverse. Accordingly, I write separately to indicate

---

to our resolution of this case because the constitution settles the question by limiting the Legislature's power to regulate universities:

> [T]he Court is not called upon to give its opinion as to whether the legislation in question is good public policy and the best part of wisdom for the Legislature and the universities to follow. We are asked only whether the legislative conditions invade the constitutional jurisdiction of the universities. Therefore, our conclusions based on the Constitution and the foregoing precedents and our analysis of the lessons they teach can be seen only in that perspective. [*Regents, supra* at 395 Mich 76.]

[16] In light of our disposition of the constitutional issue, we do not consider whether the PSC would otherwise qualify as a "public body" for purposes of the OMA.

my views, which are somewhat more constrained
than those of the majority.

I

"[I]t is well settled in Michigan that, '[c]onsti-
tutional questions will not be passed upon when
other decisive questions are raised by the record
which dispose of the case.'" *Lisee v Secretary of
State*, 388 Mich 32, 40-41; 199 NW2d 188 (1972), quot-
ing *People v Quider*, 172 Mich 280, 288-289; 137 NW
546 (1912). This longstanding rule requires us to con-
sider constitutional questions only as a last resort,
and to avoid such questions where a nonconstitu-
tional basis exists for resolving the matter. The case
before us presents the question whether defendant's
presidential search procedure violated the Open
Meetings Act (OMA). Long before we need consider
the constitutionality of the OMA, we must first logically
address the question actually before us, i.e., whether
the search in fact violated the OMA.

I am in agreement with the reasoning and rationale
of Justice KELLY's dissent with respect to this issue,
and concur, for the reasons stated in her opinion,
with her finding that the OMA was indeed violated by
the search proceeding undertaken by defendant.
Accordingly, from this point, and not before, I am
required to proceed with an analysis of the constitu-
tional question.[1]

---

[1] Traditionally, we have, as noted above, exhibited a great reluctance to
resolve constitutional questions, and done so only when that was clearly
required. Respect for both our constitution and the acts of our Legisla-
ture, as well as concepts of judicial restraint, demand no less. The major-
ity appears to act under the theory that the constitutionality of the OMA is
relevant to whether the Legislature has the power to legislate in a particu-

II

In regard to the resolution of this constitutional question, I find persuasive the language and history of Const 1963, art 8, § 4.[2] As noted by the majority, a review of the official record regarding this provision would tend to indicate that the framers considered that, where they were constitutionally creating a number of additional university governing boards, they should constitutionally include a provision opening the formal meetings to the public.[3] The obvious logic of this is that the framers thought that such an opening would need to be made constitutionally. Were that the case, a provision such as the OMA, enacted by the Legislature, would be insufficient to forcibly open a meeting of the board of a constitutional university. Further, where the framers have determined that only formal sessions of the board need be open, it would appear both that the defendant board complied with the constitutional provisions, and that an attempt to apply the OMA to force further openings of sessions

---

lar area. Of course this is true. The majority's theory strays, however, in implying we should thus inquire about the constitutionality of an act before considering its effects, since, if it is unconstitutional, it must have no effect. This truism hardly justifies the underlying suggestion, which would, effectively, replace our longstanding rules of judicial restraint and constitutional reluctance with a mandate to address constitutional questions as a preliminary matter of statutory construction. I both challenge the need for such an approach and fear the results of such unwarranted zeal.

[2] I specifically do not rely on *In re 1976 PA 267*, 400 Mich 660; 255 NW2d 635 (1977), because I find the opinion, which dealt with the interrelation of the judicial and legislative branches, to be distinguishable. Given my reliance on the language of Const 1963, art 8, § 4, I need not reach any question regarding the applicability of our decisions concerning separate branches of government to university boards.

[3] See 1 Official Record, Constitutional Convention 1961, p 1187, quoted by the majority *ante* at 90.

that were less than formal sessions of the board would be constitutionally prohibited.

Accordingly, I am able to agree with the majority that, when applied to the facts of this case, the OMA unconstitutionally invades the province of the defendant board to hold less than formal meetings in a closed setting. Because I am not persuaded of the need to rule on issues not directly before us, I would proceed no further.

Thus, I dissent from the majority's failure to ascertain whether the OMA was violated by defendant's actions, and from the majority's departure from our longstanding rule of judicial restraint regarding constitutional questions. For the reasons stated in Justice KELLY's opinion on this issue, however, I find defendant's actions to have violated the OMA, and thus would address the constitutional question. Given the language and history of Const 1963, art 8, § 4, it appears that the framers constitutionally required formal meetings of university governing boards to be open, and by this action indicated that meetings of a less than formal nature could be held in a closed setting. The existence of these constitutional parameters leads to the conclusion that a less than constitutional attempt to invade the province of these provisions (i.e., a legislative enactment such as the OMA) must fail. Accordingly, I join in the result, but only a portion of the reasoning, of the majority on this issue.

KELLY, J. (*dissenting*). This Court granted leave to determine whether the presidential selection procedure utilized by defendant violated the Open Meetings Act (OMA), MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.* Also at issue is whether application of the OMA to committees formed by the governing boards of our

public universities to assist in the selection of university presidents is constitutional.

I respectfully disagree with the majority's decision to bypass the question whether the OMA was violated. That question must necessarily be answered before addressing whether application of the OMA to defendant is constitutional.[1]

I would affirm the judgment of the Court of Appeals on both questions and hold (1) that the OMA applied to activities of the presidential search committee because it was a public body exercising a government function, and (2) the state constitution is not violated by applying the OMA to defendant's search committee.

DEFENDANT'S VIOLATION OF THE OPEN MEETINGS ACT

The Court of Appeals held that the search committee was a "public body" under the OMA and that, therefore, the OMA applied to its activities. I agree.

Under the act, all decisions of a public body must be made at a meeting open to the public. MCL 15.263(2); MSA 4.1800(13)(2). The OMA defines a "decision" as

> a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy. [MCL 15.262(d); MSA 4.1800(12)(d).]

It defines a public body as

---

[1] See *Lisee v Secretary of State*, 388 Mich 32; 199 NW2d 188 (1972).

> any state or local legislative or governing body, including a
> board, commission, committee, subcommittee, authority, or
> council, which is empowered by state constitution, statute,
> charter, ordinance, resolution, or rule to exercise govern-
> mental or proprietary authority or perform a governmental
> or proprietary function, or a lessee thereof performing an
> essential public purpose and function pursuant to the lease
> agreement. [MCL 15.262(a); MSA 4.1800(12)(a).]

The defendant Board of Trustees empowered the presidential search committee by resolution to exercise portions of the governmental authority of the board to select the university's president. The committee reviewed and studied candidates and reduced the number to be considered by the board as a whole. The parties are in agreement that the search committee narrowed the original field of candidates from over 150 to 4. I believe that its activity in this winnowing process was more than ministerial in nature, being that it involved review, discussion, and evaluation of the relative merits of the candidates. It was a form of decision making.

Once a committee is determined to be a public body, a meeting of a quorum of that body is subject to the act. In this case, the search committee was composed of four trustees and nine lay members. Thus, seven members constituted a quorum. Alternatively, if only trustees are considered, a quorum would be three. However, even a subquorum committee has been held to be subject to the OMA.

For example, in *Booth Newspapers, Inc v Univ of Mich Bd of Regents*,[2] this Court specified that the intent of the Legislature in enacting the OMA was to

---

[2] 444 Mich 211; 507 NW2d 422 (1993).

remedy the ineffectiveness of the 1968 open meetings statute and "promote a new era in governmental accountability." *Id.* at 222. We explained that "[t]he deliberation of public policy in the public forum is an important check and balance on self-government." *Id.* at 223. To further this policy, Michigan courts have "historically interpreted the statute broadly, while strictly construing its exemptions and imposing on public bodies the burden of proving that an exemption exists." *Id.*

We held that the Board of Regents of the University of Michigan is a public body under the OMA. *Id.* at 225. We continued:

> The selection of a university president is one of the board's most important exercises of governmental authority. If it establishes any form of subcommittee and empowers that subcommittee by "resolution or rule" to exercise this particular governmental authority, then that subcommittee is also a "public body" within the meaning of the act. [*Id.* (citations omitted).]

*Booth Newspapers* further held that selection of a president, whether by a one-person committee, some other committee, or the whole board, constitutes the exercise of governmental authority. Whatever the composition of the selection body, it is a public body under the OMA. *Id.* at 226.

The search committee in this case was composed of fully one-half of the members of the Board of Trustees. It was given the same authority as that given the one-person committee in *Booth Newspapers*. Applying the analysis in *Booth Newspapers*, I conclude that the search committee in this case was a public body. Moreover, it engaged in decision making

by determining which candidates would be presented as finalists to the board.

Therefore, both the reasoning in *Booth Newspapers* and a straightforward reading of the OMA indicate that the presidential search committee was a public body. As such, the committee violated the OMA when it reduced the number of candidates in private session, when it reviewed applications, and when it interviewed applicants in private. Accordingly, I would affirm the judgment of the Court of Appeals on this issue.

THE CONSTITUTIONALITY OF APPLYING THE OMA IN THIS CASE

The majority holds that application of the OMA to the internal operations of the university in selecting a president infringes on the university's constitutional power to supervise itself. I disagree.

The Michigan Constitution states in part:

> [T]he trustees of Michigan State University and their successors in office shall constitute a body corporate known as the Board of Trustees of Michigan State University. . . . [It] shall have general supervision of its institution . . . [and] shall, as often as necessary, elect a president of the institution under its supervision. [Const 1963, art 8, § 5.]

It also requires that formal sessions of governing bodies of institutions, including Michigan State University, be open to the public. Const 1963, art 8, § 4.[3]

When reviewing constitutional provisions, our objective is to give effect to the intent of the people

---

[3] I disagree with the majority's analysis of this provision. The presidential screening committee was not a "governing body" contemplated by § 4. It was, however, a public body. Because of that, it was subject to the requirements of the OMA.

who adopted the constitution. *Livingston Co v Dep't of Management & Budget*, 430 Mich 635, 641-642; 425 NW2d 65 (1988); *Macomb Co Taxpayers Ass'n v L'Anse Creuse Public Schools*, 213 Mich App 71, 78; 540 NW2d 684 (1995). In discerning such intent, we examine the circumstances surrounding the adoption of the provision and the purpose it sought to accomplish. *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971).

However, our primary focus is on the plain meaning of the constitution's language, as understood by the people who voted for it. *Livingston Co, supra.* The language must be read according to its natural, common, and most obvious meaning. *Macomb Co, supra.* Courts may place themselves in the position of the framers of the constitution to ascertain its meaning at the time it was written. *Committee for Constitutional Reform v Secretary of State*, 425 Mich 336, 342; 389 NW2d 430 (1986).

Reliance on the records of the constitutional convention is warranted only if the language of the constitution is unclear or if there is a "recurring thread of explanation binding together the whole of a constitutional concept." *Univ of Mich Regents v Michigan*, 395 Mich 52, 60; 235 NW2d 1 (1975). Due deference is to be given to contemporaneous or longstanding interpretations of the constitution by the Michigan Supreme Court. *McPherson v Secretary of State*, 92 Mich 377, 383; 52 NW 469 (1892).

Although state universities are unquestionably distinct governmental bodies, coequal with the Legislature, they have not been held constitutionally immune from all regulation by the Legislature. In *W T Andrew*

*Co v Mid-State Surety Corp*,[4] we held that, although the University of Michigan was a constitutionally created corporation, the public works bond statute could be applied to it through the Legislature's police power. Statutes designed for the benefit of society as a whole can be imposed on a constitutionally created university when they pose no direct threat to the university's financial autonomy. *Id.*

We also held that the University of Michigan was subject to a state law in *Univ of Mich Regents v Employment Relations Comm*, 389 Mich 96; 204 NW2d 218 (1973). We found that the public employees relations act could be applied to state universities without violating their constitutional autonomy. *Id.* at 108. We referred to *Branum v Univ of Mich Regents*,[5] holding that, whereas universities have independence in educational matters, they are still a part of the state government. Therefore, the Legislature can waive the universities' rights to governmental immunity, as it did for other bodies in the state government. *Id.* at 137-138. In particular, we stated:

> It is the opinion of this Court that the legislature can validly exercise its police power for the welfare of the people of this State, and a constitutional corporation such as the board of regents of the University of Michigan can lawfully be affected thereby. The University of Michigan is an independent branch of the government of the State of Michigan, but it is not an island. Within the confines of the operation and the allocation of funds of the University, it is supreme. Without these confines, however, there is no reason to allow the regents to use their independence to thwart the

---

[4] 450 Mich 655, 668-669; 545 NW2d 351 (1996).
[5] 5 Mich App 134; 145 NW2d 860 (1966).

clearly established public policy of the people of Michigan.
[*Id.* at 138-139.][6]

While I agree with the majority that "the Legislature
may not interfere with the management and control
of" universities,[7] I disagree with its conclusion that
the OMA infringes defendant's constitutional power to
supervise the institution. The OMA is not aimed at any
activities peculiar to the university and does not
attempt to change or disturb its educational activities.
Although it requires that the process of selecting a
university president be done in public, it does not tell
the board what the criteria should be for selection. It
does not dictate the process or the person to be
selected. What it does require is, when interviewing
candidates and when making a detailed review of
applications, that the university function in public
meetings.

I cannot conclude that this requirement divests the
board of its authority to select a president. The
majority holds that application of the OMA to the presi-
dential selection process infringes defendant's consti-
tutional power to supervise the university. However,
it makes no attempt to explain what constitutes the
infringement. I submit there is none.

---

. [6] See, e.g., MCL 390.101 *et seq.*; MSA 15.1121 *et seq.*, in which the Legis-
lature provided for the powers, privileges, and duties of Michigan State
University and its governing board:

> The board shall meet quarterly at stated times at Michigan state
> university and may meet at other times and places as the board
> determines. . . . The business which the board may perform shall
> be conducted in compliance with [the OMA]. Public notice of the
> time, date, and place of the meeting shall be given in the manner
> required by Act No. 267 of the Public Acts of 1976. [MCL 390.104;
> MSA 15.1124.]

[7] *Univ of Mich Regents v Michigan, supra* at 65.

The majority's reliance on *In re 1976 PA 267*,[8] is misplaced. In that case, this Court noted that the powers of government were divided among three branches of government pursuant to Const 1963, art 3, § 2. It further noted that the separation of powers set forth in the constitution was "designed to preserve the independence of the three branches of government." *Id.* at 662. Incontestably, the judiciary is one branch. Although various cases have stated that public universities are government branches coequal with the Legislature, the constitution contains no provision that elevates them to a separate branch, like the judiciary.[9] Since autonomous state universities have not achieved that status under the constitution, and *In re 1976 PA 267* dealt with a separate branch, it is inapplicable to this case.

Also, the majority states that "application of the OMA to the governing boards of our public universities is . . . beyond the realm of legislative authority." *Ante* at 89. The issue here is whether the OMA applies to only one function of the boards, the selection of the universities' presidents. The majority provides no basis for concluding that the OMA has no application to the remaining functions of the boards. Its statement in this regard could well be misleading to the public.

"Sunshine laws," such as the OMA, were adopted in Michigan as early as 1895. *Wexford Co Prosecutor v*

---

[8] 400 Mich 660; 255 NW2d 635 (1977).

[9] See *Walker v Wolverine Fabricating & Mfg Co, Inc*, 425 Mich 586, 607; 391 NW2d 296 (1986). The framers of Michigan's Constitution have eschewed creating a fourth branch of government, as it would be " 'contrary to the genius of republican government.' " *Civil Service Comm v Auditor General*, 302 Mich 673, 682; 5 NW2d 536 (1942), quoting *Colbert v State*, 86 Miss 769, 775; 39 So 65 (1905).

*Pranger*, 83 Mich App 197, 201, n 5; 268 NW2d 344 (1978). Their purpose is to prevent real and imminent danger of irreparable injury, triggered when government bodies act in secret. *Id.* In that regard, the purpose of the OMA is to "provide the public with fuller disclosure of the acts of government officials." *Rochester Bd of Ed v State Bd of Ed*, 104 Mich App 569, 582; 305 NW2d 541 (1981).

The courts and the Legislature have sought to maintain the autonomy of the constitutional universities. However, we have held repeatedly that our state-financed universities are public institutions that must function, also, within the confines of state laws. While "these two functions can touch or overlap each other, . . . understanding and goodwill is necessary that the people whom both elements represent be best served." *Regents* at 395 Mich 76.

Open government best serves the people of Michigan. I would affirm the judgment of the Court of Appeals and hold that the OMA may be constitutionally applied to constitutionally established universities in their selection of a president.