NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0172n.06

No. 19-1124

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CHARLES RUDOLPH,

    Plaintiff-Appellee,

v.

SHERYL LLOYD; DONALD WRENCH; DAVID HOULE; SANDRA HUGHES O'BRIEN; DAVID NICHOLSON; MICHAEL BUSUITO; DIANE L. DUNASKISS; MARK GAFFNEY; MARILYN KELLY; DANA THOMPSON; KIM TRENT; M. ROY WILSON,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Mar 26, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before: BATCHELDER, LARSEN, and MURPHY, Circuit Judges.

LARSEN, Circuit Judge. Wayne State University fired Charles Rudolph, a United States Army veteran, from his position as a custodian. He sought a hearing pursuant to the Michigan Veterans' Preference Act (VPA), which provides heightened job protections to veterans who work for public employers in Michigan. When no hearing was forthcoming, he sued, arguing that the VPA created a constitutionally protected property interest in his employment, and that he was, therefore, entitled to a hearing consistent with the Due Process Clause of the Fourteenth Amendment. The district court agreed. For the reasons stated, we AFFIRM.

I.

Rudolph worked as a custodian at Wayne State from 2001 until he was fired on February 24, 2015. Sheryl Lloyd, Associate Director of Custodial Operations, explained the reasons for his

termination in a letter. Lloyd stated that Rudolph had been missing from his assigned building from 6:40 a.m. to 7:01 a.m. on the morning of January 26, 2015. The letter informed Rudolph:

> Your absence from your work area, and your failure to notify your supervisor of your absence from your work area (as required), constitutes failure to follow instructions and poor work performance.
>
> On February 13, 2015, an Investigative Interview was held to give you the opportunity to give your side of the story. . . . During the interview you were asked why you left your work area without prior authorization from your supervisor. You responded by saying that you put your work equipment in the trunk of your car and you went back to your car to get it. When you were asked if you notified your supervisor that you would be out of your work area, you admitted that you did not notify your supervisor. That explanation is not acceptable because you were out of your work area for an extended period without authorization.

The letter also noted four previous incidents in which Rudolph had been reprimanded at work, once in 2010, once in 2012, and twice in 2013.

Rudolph, a United States Army veteran, then sent a letter to the Governor of Michigan requesting "a meaningful termination hearing, under the [VPA], concerning [his] job termination from Wayne State University." The Governor's office replied that the University, not the Governor, was responsible for the hearing. So, on March 25, 2015, Rudolph sent letters to the University's Board of Governors, Lloyd, and Donald Wrench, the Director of Custodial Operations, requesting a hearing pursuant to the VPA. The University responded that Rudolph had to use the grievance procedure outlined in the collective bargaining agreement covering his employment.

Rudolph then sued the defendants, some in their official capacities as members of the Wayne State Board of Governors and as President of the University, and some in their individual capacities for their direct involvement in his firing. He claimed that the defendants had violated the Fourteenth Amendment by depriving him of a property interest in his continued employment without due process. Against the official-capacity defendants, Rudolph sought reinstatement of

employment and declaratory relief. Against the individual-capacity defendants, Rudolph sought money damages. For ease, we refer to the defendants collectively as "the University" or "Wayne State."

Wayne State moved to dismiss, while Rudolph moved for partial summary judgment. The district court denied the University's motion to dismiss and granted Rudolph's motion in part. The district court concluded that the VPA applied to Wayne State and that it created a property interest in Rudolph's continued employment. Accordingly, the court held that Wayne State had violated Rudolph's due process rights by failing to provide him with notice and a hearing prior to termination. The court disagreed with Rudolph that reinstatement with backpay was the appropriate remedy, however. Instead, the court ordered a hearing on whether the University could demonstrate sufficient cause to terminate Rudolph's employment under the VPA. The parties agreed that the hearing could take place before an impartial decisionmaker, selected by the parties.

The impartial decisionmaker determined that Rudolph's termination violated the VPA and that he was entitled to reinstatement. The district court entered an order giving effect to this decision and reinstating Rudolph's employment at Wayne State.[1] The issue of damages against the individual-capacity defendants remains outstanding. The defendants timely appealed.[2]

## II.

Rudolph's Fourteenth Amendment claim is premised on the existence of a property right in his continued employment at Wayne State. If such a property right exists, "the State could not

---

[1] On appeal, the University does not argue that the district court erred by appointing an impartial decisionmaker to hold the hearing, nor does it challenge any other procedural aspect of the hearing.

[2] Rudolph moved to dismiss this appeal for lack of jurisdiction, arguing that there was no final, appealable order. This court previously concluded that we have jurisdiction because orders granting injunctive relief, such as the order directing reinstatement here, are immediately appealable. Appellate Record Entry 22.

deprive [Rudolph] of this property without due process." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). "Property interests are not created by the [federal] Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 565, 577 (1972)). But the minimum level of process required to protect a state-created property right is a question of federal constitutional law. *See Silberstein v. City of Dayton*, 440 F.3d 306, 315 (6th Cir. 2006) ("Although the existence of a property interest is defined by state law, the procedures that must be followed in depriving an individual of that property interest are defined by the federal Constitution.").

The VPA is the source of Rudolph's claimed property right. The Michigan Legislature enacted the VPA "for the purpose of discharging, in a measure, the debt of gratitude the public owes to veterans who have served in the armed services in time of war, by granting them a preference in original employment and retention thereof in public service." *Valentine v. McDonald*, 123 N.W.2d 227, 230 (Mich. 1963). The VPA thus provides that "[n]o veteran . . . holding an office or employment in any public department or public works of the state . . . shall be removed or suspended, or shall, without his consent, be transferred from such office or employment except for official misconduct, habitual, serious or willful neglect in the performance of duty, extortion, conviction of intoxication, conviction of felony, or incompetency." Mich. Comp. Laws § 35.402.

This court has previously said that "[t]he VPA takes veterans out of an at-will employment regime and provides them with a property interest in their continued employment." *Young v. Township of Green Oak*, 471 F.3d 674, 684 (6th Cir. 2006). Michigan courts have said the same. *See Sherrod v. City of Detroit*, 625 N.W.2d 437, 442 (Mich. Ct. App. 2001) ("The VPA is in the

nature of civil service law, and because it converts at-will public employment into just-cause employment, it granted the plaintiff a property right in continued employment." (citations omitted)); *see also Vayda v. County of Lake*, 909 N.W.2d 874, 879 (Mich. Ct. App. 2017).

Wayne State does not contest that the VPA generally creates a property interest in continued employment that is protected by the Fourteenth Amendment. It argues instead that the VPA did not create a property interest in Rudolph's continued employment because the VPA does not apply to the University. This is not an argument that the statute, by its terms, does not reach the University. Wayne State has not meaningfully contested, either here or before the district court, that it qualifies as a "public department . . . of the state," for the purposes of the VPA. Mich. Comp. Laws § 35.402. Instead, the University says that applying the VPA to its employment dispute with Rudolph would work an unconstitutional incursion on the autonomy provided to it by the Michigan Constitution.

Wayne State University is one of three universities named in the Michigan Constitution, along with the University of Michigan and Michigan State University. *See* Mich. Const. art. VIII, § 5. Article VIII, § 5 of the Michigan Constitution provides:

> The regents of the University of Michigan and their successors in office shall constitute a body corporate known as the Regents of the University of Michigan; the trustees of Michigan State University and their successors in office shall constitute a body corporate known as the Board of Trustees of Michigan State University; the governors of Wayne State University and their successors in office shall constitute a body corporate known as the Board of Governors of Wayne State University. Each board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds. Each board shall, as often as necessary, elect a president of the institution under its supervision. He shall be the principal executive officer of the institution, be ex-officio a member of the board without the right to vote and preside at meetings of the board. The board of each institution shall consist of eight members who shall hold office for terms of eight years and who shall be elected as provided by law. The governor shall fill board vacancies by appointment. Each appointee shall hold office until a successor has been nominated and elected as provided by law.

Wayne State argues that this provision renders the VPA unconstitutional as applied to its personnel decisions. Because the VPA cannot constitutionally apply to the University, it argues Rudolph had no property right in his job and, therefore, no federal constitutional right to the hearing that resulted in his reinstatement.

The operative constitutional language provides: "Each board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds." *Id.* The text clearly reveals, therefore, a concern with the University's fiscal autonomy. Wayne State makes no argument, however, that applying the VPA to Rudolph's employment would impermissibly interfere with its finances.

So, if the VPA is unconstitutional as applied to Wayne State, it must be because the statute impermissibly interferes with the "general supervision of [the] institution," which the Michigan Constitution entrusts to "[e]ach board" and, presumably, not to the Legislature. That language is capacious, but it does not offer universities complete immunity. The Michigan Supreme Court has declared that universities are not exempt from all regulation. *Federated Publ'ns, Inc. v. Bd. of Trs. of Mich. State Univ.*, 594 N.W.2d 491, 497 (Mich. 1999). Instead, "the legislature can validly exercise its police power for the welfare of the people of" Michigan, and a university "can lawfully be affected thereby." *Id.* (quoting *Regents of the Univ. of Mich. v Mich. Emp't Relations Comm'n*, 204 N.W.2d 218, 224 (Mich. 1973)). A constitutional university like Wayne State "is not an island." *Id.* (citation omitted). The question, then, is how to define the boundaries of the University's constitutional immunity.

The Michigan cases, although perhaps not marking all the boundaries with precision, do provide some ready guideposts. First, it seems clear that by entrusting the "general supervision of [the] institution" to each board, Article VIII, § 5 protects each University's educational autonomy.

This concern featured prominently in *Regents of the University of Michigan*, which, like the case before us, dealt directly with how to reconcile a university's constitutional autonomy with legislation governing the "resolution of public employee disputes." 204 N.W.2d at 223. In *Regents*, an association representing interns, residents, and post-doctoral fellows sought to collectively bargain with the University of Michigan Hospital pursuant to the Michigan Public Employees Relations Act (PERA). *Id.* at 219. The university declined to bargain, asserting constitutional immunity under Article VIII, § 5. *Id.* The Michigan Supreme Court held that the Michigan Constitution did not broadly exempt the university from PERA. *Id.* at 224. Instead, the Court sought to "harmonize" PERA's application to the university with the university's constitutional autonomy, which the Court repeatedly characterized as operating in "the educational sphere." *Id.* at 221, 223–24. Thus, the Court held that while PERA applied to the university generally, "the scope of bargaining . . . may be limited if the subject matter falls clearly within the educational sphere." *Id.* at 224. The Court elaborated:

> For example, the Association clearly can bargain with the Regents on the salary that their members receive since it is not within the educational sphere. While normally employees can bargain to discontinue a certain aspect of a particular job, the Association does not have the same latitude as other public employees. For example, interns could not negotiate working in the pathology department because they found such work distasteful. If the administrators of medical schools felt that a certain number of hours devoted to pathology was necessary to the education of the intern, our Court would not interfere since this does fall within the autonomy of the Regents under Article VIII, section 5. Numerous other issues may arise which fall between these two extremes and they will have to be decided on a case by case basis. Our Court will not, as it has not in the past, shirk its duty to protect the autonomy of the Regents in the educational sphere.

*Id.*

Other cases also suggest Article VIII, § 5's concern with educational autonomy. For example, in *W.T. Andrew Co. v. Mid-State Surety Corp.*, the Michigan Supreme Court rejected the University of Michigan's claim that a public works bond statute, which required a contractor to

obtain performance and payment bonds at its own cost before entering into a university construction contract, infringed on the university's constitutional autonomy. 545 N.W.2d 351, 354 (Mich. 1996). The Court reasoned that the statute neither "affect[ed] the University of Michigan financially, nor [did] it interfere with its educational autonomy. Instead, it serve[d] as an exercise of the Legislature's police power to protect the interests of contractors and materialmen in the public sector." *Id.* Similarly, in *Western Michigan University Board of Control v. State of Michigan*, the Michigan Supreme Court upheld the application of Michigan's prevailing wage act to public universities, despite its "recogni[tion] that state universities must exercise a fair amount of independence and control over their day-to day operations and the use of state university funds in furtherance of their educational purposes." 565 N.W.2d 828, 832 (Mich. 1997).

We read these cases to say that the Michigan Constitution's grant of autonomy over the "general supervision of [the] institution," Mich. Const. art. VIII, § 5, extends to decisions taken "in the educational sphere." *Regents of the Univ. of Mich.*, 204 N.W.2d at 223. But Wayne State seeks no shelter here. We can certainly envision circumstances that might pit a university's educational prerogatives against the application of the VPA to a particular employee. In this case, however, the University makes no argument that applying the statute to Rudolph's employment as a custodian would interfere with its educational autonomy.

The University instead suggests a broader immunity. It argues that the Michigan Supreme Court's decision in *Federated Publications* expanded the reach of Article VIII, § 5, such that "a law that dictates the manner in which the university operates on a day-to-day basis" is also immune from legislative interference. 594 N.W.2d at 498. And, the University continues, "the making of personnel decisions is among the most basic of day-to-day activities of the university." Appellants Br. at 18 (citing *Mayor of Detroit v. State*, 579 N.W.2d 378, 390–91 (Mich. Ct. App. 1998)

("Employing and managing personnel to carry out day-to-day operations is one of the most basic administrative functions of any branch of government.")). We do not quarrel with the latter proposition—personnel decisions may surely be described as basic day-to-day activities. But we do not read *Federated Publications* to stand for the proposition that any activity that might be broadly described as "day-to-day," or even any personnel decision, is constitutionally insulated by Article VIII, § 5. To reach that conclusion would be to say that *Federated Publications* had implicitly disavowed *Regents*, *W.T. Andrew*, and *Western Michigan*, all of which might easily be described as involving a university's "day-to-day" operations. *See Regents*, 204 N.W2d at 219 (whether to collectively bargain with University employees); *W.T. Andrew*, 545 N.W.2d at 354 (on what terms to contract with public contractors); *W. Mich.*, 565 N.W.2d at 832 (what wages to pay employees of government contractors). We see nothing in *Federated Publications* to suggest that result.

In *Federated Publications,* the Michigan Supreme Court considered whether Article VIII, § 5 permitted the application of Michigan's Open Meetings Act (OMA) "to committees formed by the governing boards of our public universities to assist in the selection of university presidents." 594 N.W.2d at 493. The Court did describe OMA as "a law that dictates the manner in which the university operates on a day-to-day basis." *Id.* But nothing about the Court's opinion suggests that it meant by that language to overrule or cast doubt on *Regents* by extending the universities' decisional autonomy to all personnel decisions, no matter how far removed from their educational mission. To the contrary, *Federated Publications* expressly cited *Regents*, explaining that "although a university is subject to [PERA], the regulation cannot extend into the university's sphere of educational authority." *Id*. at 497 (citation omitted). We are hard pressed to envision a

personnel decision more central to a university's educational mission than the one at issue in *Federated Publications*—the selection of the university's president.

Moreover, little in *Federated Publications* turned on the Court's use of the phrase "day-to-day"; instead, much turned on the specific text and original understanding of the Michigan Constitution. Looking to the Official Records of the Constitutional Convention, the Court determined that "the delegates to the Constitutional Convention of 1961 recognized that the decision whether to open meetings of university governing boards to the public lay within the boards' sphere of authority." *Id.* at 498. The Michigan Constitution of 1963 wrested that authority from the boards with respect to their "formal sessions," requiring that such meetings "be open to the public." *See* Mich. Const. art. VIII, § 4. But this implicitly left the boards with their original "power to decide whether to hold 'informal' sessions in public." *Federated Publ'ns*, 594 N.W.2d at 499. The Court, accordingly, determined that Article VIII, § 5 "prohibits the Legislature from intruding in *this* basic day-to-day exercise of the boards' constitutional power"—the power to choose whether to hold certain meetings in private. *Id.* (emphasis added).

We are, therefore, unpersuaded that *Federated Publications*' broad description of the OMA problem before it meant to expand the sphere of university autonomy to any personnel decision it might face.[3] Indeed, *Federated Publications* also reiterated the Court's longstanding formulation

---

[3] The University also cites *Sterling v. Regents of the University of Michigan*, 68 N.W. 253 (Mich. 1896), and *State Board of Agriculture v. State Administrative Board*, 197 N.W. 160 (Mich. 1924). In the former, the Michigan Supreme Court held that a law requiring the University of Michigan to move its homeopathic college from Ann Arbor to Detroit infringed on the University's autonomy. *Sterling*, 68 N.W. at 257. In the latter, the Michigan Supreme Court determined that a law giving the state administrative board the authority to exercise supervisory control over certain work at the Michigan Agricultural College [now Michigan State University] infringed upon the university's ability to manage its own affairs. *State Bd. of Agric.*, 197 N.W. at 161–62. Both cases, however, relied on *Weinberg v. Regents of the University of Michigan*, 56 N.W. 605 (Mich. 1893), which the Michigan Supreme Court has since overruled. *See W.T. Andrew*, 545 N.W.2d at 355.

of the general Article VIII, § 5 rule: "Legislative regulation that clearly infringes on the university's educational or financial autonomy must . . . yield to the university's constitutional power." *Id*. at 497. The University does not explain how application of the VPA to Rudolph's employment would meet that test. Nor does it attempt to distinguish *Regents*, which applied another employment law, PERA, to university employees, so long as its application would not intrude on the "educational sphere." 204 N.W.2d at 224. And, of course, it does not claim any violation of its prerogative to decide whether to hold certain meetings in private. Guided by the Michigan Supreme Court's interpretation of Article VIII, § 5, we cannot conclude that the Michigan Constitution prohibits application of the VPA to Rudolph's employment.

For the first time on appeal, the University raises a new constitutional argument, grounded in separation-of-powers principles under the Michigan Constitution. The argument proceeds as follows: The VPA mandates that the Governor conduct the good-cause hearings required by the statute. *See* Mich. Comp. Laws § 35.402. But the Governor lacks the power under the Michigan Constitution to supervise the Board of the University. Accordingly, giving the Governor power to review University personnel decisions through the VPA violates the separation of powers under the Michigan Constitution.

We do not ordinarily entertain arguments not presented to the district court. *See Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006). This argument, moreover, is not only belatedly raised, it is entirely hypothetical. The only question for our review is whether the events that actually transpired in this case were consistent with the federal Constitution. And in this case, the Governor did not hold, or supervise, the good-cause hearing. Instead, Wayne State and

As such, *Sterling* and *State Board of Agriculture* are not representative of the current state of Michigan law.

Rudolph agreed upon an independent decisionmaker. It is no surprise that neither party complains that this procedure, to which they consented, violated the VPA; neither does Rudolph complain that these procedures were constitutionally inadequate. *See Silberstein*, 440 F.3d at 315 (recognizing that the federal Constitution, not state law, defines the process required to protect a property interest). Accordingly, our review of the procedural component is at its end.[4] The facts of this case give us no occasion to address the question of Michigan separation-of-powers law belatedly posed by the University.

Wayne State also argues, for the first time on appeal, that public policy prohibits the application of the VPA to its personnel decisions. According to the University, "[l]egislative intrusion into a university's autonomy is permissible only if the legislation reflects 'clearly established public policy' of the state." Appellants Br. at 24 (quoting *Regents of the Univ. of Mich. v. State*, 419 N.W.2d 773, 778 (Mich. Ct. App. 1998)). Wayne State says that no clearly established public policy requires the University to comply with the VPA. Instead, it says that the clear state policy is that the University must collectively bargain with its employees under PERA, which, in its view, prevails over the VPA. To rule for the University on this forfeited claim, we would need to decide that two Michigan statutes conflict, such that both cannot be given effect; that one trumps the other (presumably as a matter of statutory construction); and that the University's preferred statute (PERA) reflects the "clear" public policy in Michigan's public labor relations sector at the expense of another duly enacted Michigan law (the VPA). Such weighty, unresolved questions of state law deserve full consideration by a lower court before appellate

---

[4] We also express no view on whether the grievance procedure outlined in the collective bargaining agreement governing Rudolph's employment could have afforded sufficient process to satisfy the federal Constitution. The University makes no such argument.

review.  We decline to exercise our discretion to review these forfeited arguments here.  *See In re Morris*, 260 F.3d 654, 664 (6th Cir. 2001).

\* \* \*

Wayne State has not shown that applying the VPA to Rudolph's employment would impermissibly infringe on the University's authority under the Michigan Constitution as construed by the Michigan Supreme Court.  As a result, the district court did not err by concluding that Rudolph had a property interest in his job, protected by the federal Due Process Clause.  We AFFIRM.